UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **No. 12 CR 22** |
| | ) | |
| | ) | **Judge Virginia M. Kendall** |
| STEPHEN LINDER | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On January 12, 2012, a federal Grand Jury indicted Defendant Stephen Linder, a Deputy United States Marshal for the Northern District of Illinois, in a four count Indictment charging that he violated the civil rights of two individuals by using excessive force against them on two separate occasions and then attempted to conceal or prevent information regarding those incidents to be presented in the course of the investigations that followed. (Doc. 1, Indict. at 1-2.)[1] Specifically, the Indictment charges that Linder struck and choked Individual S.S. on July 8, 2010 (Count I) and head-butted Individual E.U. on May 18, 2008 (Count III), both acts in violation of 18 U.S.C. § 242. (*Id.*) The Indictment also charges that Linder then attempted to corruptly persuade two other individuals, known respectively as Individual H.S. and Individual S.M., to withhold evidence concerning the conduct charged in Counts I and III from federal authorities with the intent to hinder, delay, and prevent the communication of information relating to the possible commission of a federal offense in violation of 18 U.S.C. § 1512(b)(3)

---

[1]  Citations to the pleadings, orders, minute entries, motions, transcripts, notices, and other materials filed in the Docket for this case are designated, "(Doc. __.)." Citations to the evidentiary hearing transcript, sequentially numbered from pages 1 to 847, are designated, "(Tr. at __.)." Citations to the exhibits received into evidence by the Court are, with respect to Defendant Linder's exhibits, designated, "(Doc. 48-1, Def.'s Exs. __.)," and with respect to the Government's exhibits, designated, "(Docs. 50-1-50-9, Gov.'s Exs. __.)."

(Counts II and IV). (*Id*.) Linder moved to dismiss the Indictment against him, alleging that the prosecution team violated his Sixth Amendment right to compulsory process of witnesses in his favor and his Fifth Amendment right to due process of law through its intentional interference with his right to conduct a defense investigation and interview prospective witnesses. (Doc. 26, Def.'s Mot. to Dismiss the Indict.) Because after an evidentiary hearing on the matter, this Court finds that the prosecution team substantially interfered with Defendant's access to victims, exercised an overly aggressive approach to witnesses by threatening them with prosecution, and violated the Defendant's constitutional rights, the Court dismisses the Indictment.

## PROCEDURAL HISTORY

On January 12, 2012, after presentation by assistant United States Attorneys for the Civil Rights Division of the Department of Justice, a grand jury returned the four-count indictment against Linder. (Doc. 1, Indict.) There is no explanation in the record as to why the United States Attorney for the Northern District of Illinois or Assistant United States Attorneys for the Northern District of Illinois did not participate in the investigation or presentation of the case before the grand jury. Although one might conjecture that the reason for the United States Attorney's Office for the Northern District of Illinois not participating in the investigation might be due to their reluctance to prosecute a deputy marshal from their own district, this has not been the case in the past. *United States v. Ambrose*, 668 F.3d 943, 948 (7th Cir. 2012).

On April 20, 2012, Linder filed five pretrial motions, requesting that the Court grant him assorted forms of relief and provide him with various remedies at law. (Doc. 22, Def.'s Mot. for the Early Ret'n of Tr. Subps.; Doc. 23, Def.'s Mot. for Disc'l. of Fav. Evid.; Doc. 24, Def.'s Mot. for a Bill of Partic's; Doc. 25, Def.'s Mot. to Suppress; Doc. 26, Def.'s Mot. to Dismiss the Indict.) On August 9, 2012, in a written Memorandum Opinion, the Court resolved two of

Linder's remaining motions. *See United States v. Linder*, No. 12 CR 22-1, 2012 WL 3264924, at *3, *15 (N.D. Ill. Aug. 9, 2012); (Doc. 42, Mem. Op. at 6, 35-36). First, the Court granted Linder's motion for a Bill of Particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, (Doc. 24, Def.'s Mot. for a Bill of Partic's) (citing Fed. R. Crim. P. 7(f) ("The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.")). *See Linder*, 2012 WL 3264924, at *3, *15; (Doc. 42, Mem. Op. at 6, 35-36). Second, the Court denied Linder's motion to suppress evidence obtained by the Government allegedly pursuant to a warrantless search and seizure of his electronic property in violation of the Fourth Amendment to the United States Constitution, (Doc. 25, Def.'s Mot. to Suppress at 1.) *See Linder*, 2012 WL 3264924, at *3, *15; (Doc. 42, Mem. Op. at 6, 35-36). However, the Court was unable at that time to resolve Linder's motion to dismiss the Government's Indictment against him, (Doc. 26, Def.'s Mot. to Dismiss the Indict.). *See Linder*, 2012 WL 3264924, at *23; (Doc. 42, Mem. Op. at 55) ("Based on the partially disputed factual record in this case it cannot be determined at this time whether Linder's Fifth Amendment right to due process of law or his Sixth Amendment right to compulsory process of witnesses have been violated.").

After reviewing the briefs, motions, and papers submitted by both parties, (Doc. 26, Def.'s Mot. to Dismiss the Indict.; Doc. 28, Gov.'s Resp. to Def.'s Mot. to Dismiss the Indict.; Doc. 33, Def.'s Reply in Supp. of Def.'s Mot. to Dismiss the Indict.), in addition to conducting a comprehensive independent assessment of the relevant governing caselaw, this Court entered an Order on August 9, 2012, requiring that an evidentiary hearing be held on Linder's Motion to Dismiss the Indictment because on the record then before the Court a determination was not

possible of whether Linder's constitutional rights had been violated or whether the Government had engaged in prejudicial misconduct against him. *See Linder*, 2012 WL 3264924, at *23; (Doc. 42, Order at 55-56) ("An evidentiary hearing is required in this case to resolve the issue of whether the indictment against Linder should be dismissed. On the record currently before the Court it is not possible to ascertain many of the facts that will be dispositive of the instant [m]otion.").

Specifically, the Court identified two principal areas in which inquiry at an evidentiary hearing was deemed necessary to making a determination of whether the motion now under consideration should be granted and the Government's Indictment against Linder dismissed. *See Linder*, 2012 WL 3264924, at *23; (Doc. 42, Mem. Op. at 56-57). The first area related to whether the United States Marshal for the Northern District of Illinois, Darryl McPherson, as well as those acting under his command, constituted part of the prosecution team and whether their acts in the investigation and prosecution of Linder could be imputed to the prosecution team. *See Linder*, 2012 WL 3264924, at *23; (Doc. 42, Mem. Op. at 56-57) ("First, the Court must determine whether McPherson was acting as part of the 'government' when he e-mailed the guidelines. The degree of participation of McPherson and the people under his command with the investigation is a necessary fact that must be adduced. It must be determined whether the guidelines can be imputed onto the prosecution.").

The second area of inquiry that the Court deemed critical to resolving the instant motion related to whether the Government's actions actually deterred witnesses from meeting with Linder and the defense team in violation of his Sixth Amendment right to compulsory process of witnesses in his defense, or otherwise violated Linder's constitutional rights—and if so—whether Linder suffered prejudice as a consequence. *See Linder*, 2012 WL 3264924, at

*15, *23; (Doc. 42, Mem. Op. at 36, 56-57) ("This Court is empowered, and indeed it possesses a duty, to dismiss an indictment when it violates the Constitution or laws of the United States .... [I]t is necessary to know whether any USMS employees actually felt threatened or intimidated by the e-mails and for that reason chose not to speak with Linder's defense counsel. . . . Most importantly, the Court has to determine whether the government interfered with a potential defense witness's free choice to testify[.]").

Pursuant to its Order of August 9, 2012, (Doc. 42, Order at 55-56), the Court conducted a four-day evidentiary hearing on Linder's motion to dismiss the Indictment, commencing on September 18, 2012 and concluding on September 21, 2012. (Docs. 54-57, Min. Entries; Docs. 61-68, Tr. of Hr'g.) The Government called three witnesses to testify at the hearing: (1) Stanley Griscavage, Jr., former Chief, United States Marshals Service ("Marshal Service"), Office of Inspection, Internal Affairs; (2) Kimberly Thomas, Assistant Special Agent, United States Department of Justice, Office of the Inspector General ("OIG"); and (3) Darryl McPherson, United States Marshal, Northern District of Illinois. (Docs. 54-55, Min. Entries; Docs. 61-64, Tr. of Hr'g; Tr. at 4-306.)

Linder called eleven witnesses to testify for him: (1) John O'Malley, Chief Deputy, Marshal Service, Northern District of Illinois; (2) James Smith, Deputy United States Inspector, Judicial Security Division, Marshal Service, Northern District of Illinois; (3) Ed Farrell, Supervisory Inspector, Marshal Service, Northern District of Illinois and Supervisor, Great Lakes Regional Fugitive Task Force ("GLRFTF"); (4) Theodore Stajura, Lieutenant, Cook County Sheriff's Police Department; (5) John Hadjioannou, Detective, Berwyn Police Department; (6) Richard Walenda, Inspector, Marshal Service, Northern District of Illinois; (7) Paul Zitsch, Deputy United States Marshal ("DUSM"), Marshal Service, Northern District of

Illinois; (8) Troy Brejc, DUSM, Marshal Service, Northern District of Illinois; (9) Lorne Stenson, DUSM, Marshal Service, Northern District of Illinois; (10) George Peters, DUSM, Marshal Service, Northern District of Illinois; and (11) Kevin Shirley, Senior Special Agent, United States Department of Justice, OIG. (Docs. 56-57, Min. Entries; Docs. 64-68, Tr. of Hr'g; Tr. at 306-840.) All of the witnesses Linder called to testify at the evidentiary hearing were compelled to attend by force of subpoenas served on them by the defense. (*See* Tr. at 10, 308, 382, 394, 465, 553, 567, 693.)

In addition to the testimony that was adduced at the hearing, the parties submitted pre-hearing briefs and memoranda that contained exhibits and affidavits. (Doc. 48, Def.'s Pre-Hr'g Br.; Doc. 48-1, Def.'s Exs.; Doc. 50, Gov.'s Pre-Hr'g Mem.; Docs. 50-1-50-9, Gov.'s Exs.) All of these exhibits and affidavits were received into evidence by the Court and placed into the record. (*See* Tr. at 306)

At the conclusion of the testimony and presentation of the evidence, the Court entered an Order requiring the parties to submit post-hearing position papers, (Doc. 85, Min Entry; Tr. at 841; Doc. 57, Min. Entry; Doc. 68, Tr. of Hr'g.), which both parties did, (Doc. 86, Def.'s Post-Hr'g Br.; Doc. 87, Gov.'s Post-Hr'g Br.). The Court conveyed specific instructions to the parties, which came in the form of an Order, clearly stating exactly what the Court wanted the parties' post-hearing position papers to contain. (Doc. 85, Min Entry; Tr. at 841; Doc. 57, Min. Entry; Doc. 68, Tr. of Hr'g.) In addition, the Court ordered the parties to submit their post-hearing position papers in a format consisting of proposed findings of fact and conclusions of law. (Doc. 85, Min Entry; Tr. at 841; Doc. 57, Min. Entry; Doc. 68, Tr. of Hr'g.) The Government failed to follow the Court's Order, (Doc. 85, Min Entry; Tr. at 841; Doc. 57, Min. Entry; Doc. 68, Tr. of Hr'g.; Doc. 87, Gov.'s Post-Hr'g Br.), and instead submitted a conclusory

and argumentative brief without findings of fact from the record. The Government's failure to comply with the clear and explicit Order only further exposes some of the weaknesses in the Government's position with respect to Linder's Motion to Dismiss the Indictment. (Tr. at 841; Doc. 26, Def.'s Mot. to Dismiss the Indict.; Doc. 87, Gov.'s Post-Hr'g Br.)

The prosecution of this case against Linder, like all federal prosecutions for the alleged violations of the laws of the United States, is being conducted under the authority of the United States Attorney.[2] The United States Attorneys (and Assistant United States Attorneys) are the officers within the Executive Department of Article II of the Constitution charged with the responsibility and discretionary power to decide whether prosecutions should be commenced or maintained for violations of the criminal laws of the United States, and the federal courts are generally advised not to interfere with the United States Attorneys's discretion in the exercise of their control over federal criminal prosecutions. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion."); *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("Since the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case, it is contended that a President's decision is final in determining what evidence is to be used in a given criminal case.").

---

[2] Specifically, the case is being prosecuted by Assistant United States Attorney AeJean Cha and Assistant United States Attorney Mark Blumberg, who are AUSAs in the Department of Justice's Civil Rights Division.

Notwithstanding the proposition that the federal courts are counseled not to interfere with the United States Attorneys' discretion in their authority over federal criminal prosecutions, "[t]he judiciary has always borne the basic responsibility for protecting individuals against unconstitutional invasions of their rights by all branches of the Government." *United States v. Falk*, 479 F.2d 616, 624 (7th Cir. 1965); *see also Zivotofsky ex rel. Clinton*, —U.S.—, 132 S. Ct. 1421, 1440 (March 26, 2012) (Breyer, J., dissenting) ("Nor, importantly, does [the defendant] assert an interest in vindicating a basic right of the kind that the Constitution grants to individuals and that courts traditionally have protected from invasion by the other branches of Government."); *United States v. Butler*, 297 U.S. 1, 62-63 (1936) ("There should be no misunderstanding as to the function of this court in such a case. It is sometimes said that the court assumes a power to overrule or control the action of the people's representatives. This is a misconception. The Constitution is the supreme law of the land ordained and established by the people."); A. Hamilton, Federalist Paper No. 78, reprinted in Cooke (ed.), The Federalist 521, 524-25 (1961).

In *Berger v. United States*, 295 U.S. 78, 88 (1935), the United States Supreme Court stated:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very different sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Adherence to this standard by the United States Attorneys is necessary to the proper administration of justice. When prosecutors fail to fulfill their obligations under the law it is

justice that suffers.[3]   The D.C. Circuit has said of this "peculiar" nature of the United States

Attorneys that "[a]n attorney for the United States, as any other attorney, however, appears in a

---

[3]

  The regulations promulgated by the Office of Government Ethics contain "Standards of Ethical Conduct for Employees of the Executive Branch," which United States Attorneys are.  The "basic obligation of public service" is as follows:

> Public service is a public trust. Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain.  To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.

> The following general principles apply to every employee and may form the basis for the standards contained in this part.  Where a situation is not covered by the standards set forth in this part, employees shall apply the principles set forth in this section in determining whether their conduct is proper. (1) Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain.  (2) Employees shall not hold financial interests that conflict with the conscientious performance of duty.  (5) Employees shall put forth honest effort in the performance of their duties.  (7) Employees shall not use public office for private gain.  (8) Employees shall act impartially and not give preferential treatment to any private organization or individual.  (11) Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities.  (13) Employees shall adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.  (14) Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts.

5 C.F.R. § 2635.101(a); (b)(1)-(14) (2013).

The basic policy of the Department of Justice as to the standard of conduct of the United States Attorney's Office personnel as set forth in the United States Attorney's Manual is as follows:

> Employees shall . . . conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government. In all their activities, personal and official, they should always be mindful of the high standards of behavior expected of them. . . .

9

dual role. He is at once an officer of the court and the agent and attorney for a client; in the first capacity he is responsible to the Court for the manner of his conduct of a case, i.e., his demeanor, deportment and ethical conduct; but in his second capacity, as agent and attorney for the Executive, he is responsible to his principal and the courts have no power over the exercise of his discretion or his motives as they relate to the execution of his duty within the framework of his professional employment." *Newman*, 382 F.2d at 481 (Per Chief Justice Burger, Circuit Justice).

## MOTION TO DISMISS

Linder moves this Court to dismiss the Indictment with prejudice arguing that the prosecution team violated his Sixth Amendment right to compulsory process of witnesses in his favor and his Fifth Amendment right to due process of law through its "intentional interference with the [D]efendant's right to conduct a defense investigation and interview prospective witnesses." (*Id*. at 1.) In particular, Linder claims that Marshal McPherson, while acting as an arm of the prosecution, "directed employees under his command to not communicate with Linder and his legal counsel, thereby thwarting Linder's due process and fair trial constitutional protections." (*Id*. at 5.) Linder claims that two e-mails which were issued on behalf of the United States Marshal must be imputed to the prosecutors because the Marshal and his employees have served as an arm of the prosecution. The e-mails threatened deputies to not speak with the defense and have contact with Linder, or they would suffer employment consequences or disciplinary proceedings.

Linder argues that aside from the e-mails that prevented his access to witnesses, prospective defense witnesses have also been threatened and intimidated by the Office of Inspector General investigator and the prosecutors to cooperate with the prosecution or they

would potentially lose their jobs or be prosecuted as coconspirators of the defendant. Witnesses, he alleges, are not only afraid of losing their jobs, they are afraid of being charged with crimes and being prosecuted. Recognizing this, Linder claims the witnesses will not tell the truth even if the Marshal were to withdraw the access restrictions and the threats ceased. In fact, the Marshal has already modified his directions to the deputies; yet, according to Linder, the witnesses are scared and the defense has lost its opportunity to interview these witnesses without restriction or fear of retaliation. (*See Id.*) Linder concludes by declaring that the "very fundamental element of due process of law is broken here and it is beyond repair." (*Id.*)

## FINDINGS OF FACT[4]

On July 8, 2010, Stephen Linder, acting in his capacity as a Deputy United States Marshal for the Northern District of Illinois, allegedly used excessive force against Santiago Solis, the father of a fugitive of federal law enforcement who was wanted for murder. (Tr. at 179, 544-49; Doc. 48-1, Ex. Walenda July 13, 2010 Report of Investigation.) Another DUSM, Harry Sims, believing that he had witnessed Linder use excessive force against Solis, informed Supervisor Ken Robinson that it was his belief that Linder had committed a civil rights violation against a civilian. (Tr. at 179) Sims is therefore the reporting complainant against Linder in this matter. (*Id.* at 174). According to Sims, Linder, with a closed fist, punched Sims, who was handcuffed at the time. (*Id.* at 179.) The alleged 2008 civil rights violation charged in Count III of the indictment proceeded through administrative review at the time of its occurrence over

---

[4]

The Court's findings of fact are derived from the testimony of the witnesses adduced at the evidentiary hearing, in addition to all other forms of evidence received into the record, (Docs. 54-57, Min. Entries; Docs. 61-68, Tr. of Hr'g), and the Court's own credibility determinations after observing the demeanor of the witnesses on the stand.

three years ago and was declined for prosecution at that time but has been revived and charged in this indictment.[5] (*Id*. at 321.)

On July 12, 2010, Sims and Robinson made management within the District office of the Marshal Service, including United States Marshal Darryl McPherson and Chief Deputy Marshal John O'Malley, aware of the allegations regarding Linder. (*Id*. at 170, 308.) McPherson became the United States Marshal for the Northern District of Illinois a matter of weeks prior to the Linder incident, in June of 2010. (*Id*. at 163-64.) O'Malley has been with the Marshal Service for 23 years, and is the second in command of the Marshal Service within the District. (*Id*. at 307-08.) O'Malley testified that in the entire course of his 23 year career with the Marshal Service he has never dealt with an OIG investigation concerning an allegation of excessive force. (*Id*. at 363-64.) When he heard the allegations against Linder, McPherson appropriately considered it to be serious and, along with Sims and Robinson, went to O'Malley's office to discuss the matter with him. (*Id*. at 117, 179.)

Upon hearing the allegations from Sims, Robinson, and McPherson, and "[a]s soon as everyone cleared [his] office," O'Malley contacted Herman Brewer, who at that time was the Chief of the Marshal Service's Office of Inspection. (*Id*. at 170, 309-10, 365.) The Office of Inspection is, according to former Chief of Internal Affairs Stanley Griscavage,[6] "the entity in the Marshals Service responsible for the integrity of the Marshals Service programs, activities, and personnel." (*Id*. at 16.) At the time of the Linder investigation, Griscavage was the Chief of Internal Affairs. (*Id*. at 31.) Internal Affairs is a "subcomponent" of the Office of Inspection.

---

[5] No facts were presented by the Government regarding this resurrected charge.

[6] The Government called Griscavage as its first witness. (Doc. 54, Min. Entry; Tr. at 16.) Griscavage had no contact with the District office, and has no first-hand knowledge of what the Office of Inspection told the District office to do, if anything. (Tr. at 25-26.) Brewer simply gave Griscavage the complaint for review and processing. (*Id*. at 26.)

(*Id*. at 16, 43.)  The office of Internal Affairs is located in Washington, D.C., and Marshal Service district offices do not have their own Internal Affairs offices.  (*Id*. at 18.)  Internal Affairs receives complaints and allegations of misconduct by Marshal Service personnel.  (*Id*. at 17.)  Its primary responsibility is to process those complaints and allegations, to investigate when appropriate, and if substantiated, to refer them "on to another office for adjudication." (*Id*.)  Internal Affairs ordinarily refers complaints and allegations to the Department of Justice's Regional OIG for review and potential criminal investigation.  (*Id*. 17, 20.)

In a civil rights case "there's one additional step;" not only does Internal Affairs make its standard referral to the Regional OIG, it also refers the case to the Department of Justice's Civil Rights Division.  (*Id*. at 24.)  In the Linder matter, Internal Affairs made formal referrals of the complaint to both the Department of Justice, Civil Rights Division and the OIG, Chicago Field Office.  (*Id*. at 27.)

Both the Civil Rights Division and the OIG exercise a great deal of discretion in determining whether and when one of these two investigative and prosecutorial departments wants to open an investigation into the matter referred to it by the Marshal Service's office of Internal Affairs.  (*Id*. at 24.)  When a case is being investigated by the OIG, the Marshal Service maintains an open case file on the subject.  (*Id*. at 21.)  Furthermore, Marshal Service procedures call for assigning an investigator from Internal Affairs to act as "the point of contact for the [OIG] investigator" in order "[t]o assist the external agency investigator with collecting documents, setting up witness interviews," and "[w]hatever else is needed."  (*Id*. at 22.)  The individual assigned to the Linder case was Internal Affairs Investigator Jeremy Honaker.  (*Id*.)

Once a case is reported to the OIG, the Department of Justice typically takes one of three actions.  (*Id*. at 21, 44.)  One course is for the OIG to retain the case for itself and conduct the

investigation on its own. (*Id.* at 21, 44.) Another option is for the OIG to refer the complaint back to the Marshal Service as a "management issue," meaning that the issue is one for the Marshal Service to resolve on its own. (*Id.* at 21, 44.) Finally, the OIG might send the complaint back to the Marshal Service with the intention of conducting a joint investigation. (*Id.* at 21, 44.)

Upon receiving O'Malley's call, Brewer instructed him to "put all of the facts together in a summary form" and to send the information directly to him. (*Id.* at 310.) Brewer said that he would "have it assigned out or referred to" the OIG. (*Id.*) On July 14, 2010, O'Malley sent an e-mail with attachments, including a memorandum and a Report that he had written, to Brewer at the Office of Inspection, thereby giving written notice of the allegations against Linder and formally requesting an investigation. (*Id.* at 27, 30; Doc. 48-1, Ex. O'Malley July 14, 2010 E-mail and Memo; Doc. 48-1, Ex. O'Malley July 14, 2010 Report.) Once Brewer received the e-mail he forwarded it to Griscavage on July 15, 2010. (Tr. at 27, 31.) All cases concerning the use of excessive force are reported as a matter of course to the OIG. (*Id.* at 58.) Griscavage testified that a district office would not be asked to do an investigation, including conducting witness interviews, at the initial stages of an investigation, and definitely not before the Office of Inspection and the OIG had conducted their own reviews. (*Id.* 46.) The Office of Inspection would never ask a district office to investigate an allegation of excessive use of force; such cases are referred to the Department of Justice—either to the OIG or the Civil Rights Division. (*Id.* at 57.) In Linder's case, the OIG determined that it would retain the case and handle the investigation itself. (*Id.* at 28.)

After learning of the allegations from Sims, McPherson testified that he was present in the District office when O'Malley called Brewer and that they all communicated on a speaker

phone. (*Id.* at 116-17, 171.) According to McPherson, Brewer told him and O'Malley that they were "within their rights . . . to bring Deputy Linder into the office and speak to him." (*Id.* at 172.) McPherson further testified that Brewer "also advised [them] to send out a couple of deputies" to speak to the alleged victim or anyone at the alleged victim's residence in order "[t]o see how valid the accusations were that were being made by" Sims and whether they had any merit. (*Id.* at 117, 174.) In his 23 years with the Marshal Service, O'Malley testified that he has "never" heard of a DUSM going out into the field to conduct an interview of an alleged victim in a civil rights investigation. (*Id.* at 324.)

Deputies Banos and Walenda were selected to conduct the interview of Solis because they were removed from the warrant unit and assigned to the threat unit. (*Id.* at 180.) McPherson testified that Walenda and Banos were brought into O'Malley's office and that McPherson and O'Malley "both spoke to them" and both gave them instructions. (*Id.* 176-77.) McPherson stated that they gave Walenda and Banos the name and address of Sims, the alleged victim, and the fact that there was an incident that occurred that involved the Marshal Service.[7] (*Id.* at 177-78.) Walenda testified that McPherson told him the name of the alleged victim, the alleged victim's address, and the subject matter of the interview, namely, the events surrounding the fugitive investigation. (*Id.* at 567, 570, 573-75, 578.)

On July 12, 2010, the day that the Marshal Service management learned of the allegation against Linder, McPherson summoned Linder into a meeting in his office and confronted him and questioned him about Sims's allegations for approximately 15 to 20 minutes in the presence of O'Malley, as well as Linder's supervisors, Supervisory Inspector Ed Farrell, and Supervisory

---

[7] McPherson and O'Malley disagree about who selected the deputies and directed them. Regardless, Banos and Walenda went at the direction of a superior in the Marshal Service and that is not disputed.

Deputy United States Marshal Matthew Block, Linder's direct supervisor. (*Id*. at 120-21, 202, 346, 402.) McPherson testified that he only informed O'Malley, Farrell, and Block that there was an "incident that occurred out on the street involving Deputy Linder." (*Id*. at 196.) Farrell expressed his concerns to the group about questioning Linder without providing him with any form of warning and in the absence of legal counsel. (*Id*. at 397-98.) According to the United States Marshals Service Policy Directives, in a misconduct investigation the Marshal Service employee has certain rights, including rights to notice and warnings. (*Id*. at 211.) However, no one advised, gave warnings, or provided Linder with any such forms. (*Id*. at 218.) O'Malley testified that Linder's interview was "out of the ordinary," (*id*. at 315), but that he nevertheless complied with the directions of his superior. (*id*. at 316).

According to McPherson, after Linder was summoned into his office, he and O'Malley questioned Linder and the "questioning was led by O'Malley." (*Id*. at 204.) O'Malley testified that Linder answered the questions they asked of him. (*Id*. at 317, 320, 401-03.) O'Malley asked Linder if there was any reason he could think of as to why he would be called into the Marshal's office, to which Linder answered that he had no idea. (*Id*. at 121, 317.) McPherson then questioned Linder about his fugitive cases. (*Id*. at 200.) After that, Linder was informed that an allegation had been made against him. (*Id*.) Either McPherson or O'Malley brought up the topic of the alleged incident reported by Sims. (*Id*.) McPherson or O'Malley questioned Linder about whether he had used force in the fugitive operation that was the subject of Sims's allegation against him. (*Id*. at 122, 204-05.) According to McPherson, Linder confirmed that he did use force during the incident. (*Id*. at 123.) Linder claimed that the force that was used was putting up his arms to block Solis from possibly head-butting him. (*Id*. at 123.) This was consistent with O'Malley's July 14, 2010 e-mail to Internal Affairs states, concerning the use of

force, which stated that "[w]hen asked if at any time [Linder] used physical force on the individual, he stated that he may have placed his elbow towards the face." (*Id*. at 347; Doc. 48-1, Ex. O'Malley July 14, 2010 E-mail.)

McPherson continued the interview by questioning Linder about the forms that the Marshal Service uses in connection with the use of force, the USM-133 Use of Force Report Form, and he asked Linder whether he had completed a USM-133 Form in connection with the subject incident. (Tr. at 123, 205, 357.) McPherson conceded that when Linder asked whether he needed legal counsel, the participants in the meeting decided that Linder "didn't need to answer any more questions," and the interview essentially ceased. (*Id*. at 221, 322-23, 357.) Finally, Linder asked if he was permitted to leave, to which McPherson replied that he was. (*Id*. at 123-24, 349.) Linder did not say anything incriminating during this meeting. (*Id*. at 124.) After the meeting ended, O'Malley wrote a Report about it and forwarded it to Internal Affairs. (*Id*.) McPherson explained that Brewer gave him directions to interview Linder. (*Id*. at 220.) On July 13, 2010, upon the direction of the U.S. Marshal, Walenda and Banos traveled to Solis's residence in Cicero, Illinois, at which time they interviewed Solis, the alleged victim, and took a photograph of him. (*Id*. at 182.) During the visit, Walenda and Banos asked Solis three different times what happened on the day of the incident before Solis ever stated that he had been hit by "a Cicero police officer." (*Id*. at 183-84.) Later that day, Walenda and Banos reported back to McPherson and met with him and O'Malley. (*Id*.) Walenda and Banos advised McPherson and O'Malley about the substance of the interview that they had conducted and displayed the photograph that they had taken of Solis. (*Id*. at 183, 312; Doc. 48-1, Ex. Solis July 13, 2010 Photograph.) They informed them that it had taken three attempts before Solis stated anything about being hit and that he did not show any injuries to his face. (*Id*. at 583-84)

The next day Walenda and Banos were sent to Solis's residence for a second time. (Tr. at 312.) Walenda testified that he believed that it was McPherson who told him to go back and take more photographs of Solis, the alleged victim. (*Id*. at 588.) O'Malley testified that when he discovered that Walenda and Banos had interviewed Solis and taken a single photograph, he sent them back out to Solis's residence because the first interview was conducted poorly and the photograph was insufficient. (*Id*. at 312.) Walenda and Banos interviewed Solis, the alleged victim, a second time and took eleven additional photographs of him. (*Id*. at 588-89.) After they conducted the second interview of the alleged victim, Walenda and Banos again reported back to McPherson. (*Id*. at 589-90.) Nobody from the Office of Inspection was contacted or made aware of the investigative decision, by either McPherson or O'Malley, to send Marshal Service personnel out to interview Solis, the alleged victim, a second time. (*Id*. at 48.)

On July 15, 2010, McPherson confronted Linder a second time in the presence of his supervisors. (*Id*. at 222.) The meeting occurred at 700 North Sacramento Blvd., Chicago, Illinois, which is the office of the Great Lakes Regional Fugitive Task Force ("GLRFTF"), where Linder was working. (*Id*.) According to Farrell, the GLRFTF "[i]s a conglomerate of law enforcement agencies. [The] lead agency is the U.S. Marshals Service. [The GLRFTF] work[s] with federal, state, and local partners as a team, capturing violent fugitives in the greater Chicagoland area." (*Id*. at 393.) The GLRFTF looks "for fugitives…based on warrants coming from both state courts as well as federal courts." (*Id*. at 394.) The GLRFTF is "congressionally mandated to go after violent fugitives. Those would be anyone wanted from homicide, to sexual assault, to rape, to battery [ ]. Any crime of violence where they're a significant threat to the community." (*Id*.) Present at the July 15 meeting was McPherson, O'Malley, Farrell, Block, Commander Jason Grunwald, and Assistant Chief Decker. (*Id*. at 223.) Before Linder came into

the meeting, there was a discussion concerning the possible reassignment of Linder to the District office from the GLRFTF. (*Id*. at 223.) Linder was eventually brought into the meeting and informed that he was being brought back to the District. (*Id*. at 228.)

There are deputies from Marshal Service from the District assigned to the GLRFTF. (*Id*. at 395.) The Marshal retains the ultimate authority to pull those deputies back to the District office of the Marshal Service and off of the GLRFTF. (*Id*. at 168, 395.) With respect to the Marshal's authority over the GLRFTF, Farrell testified: "There are deputies from the district that are assigned to the Great Lakes Task Force. He has the ability to pull those deputies back." (*Id*. at 395.) Following the July 15 meeting, McPherson reassigned Linder back to the District office, as he said he was going to, to do court operations. (*Id*. at 227.) McPherson pulled Linder off of the GLRFTF and back to the District office notwithstanding the fact that both O'Malley and Grunwald agreed that Linder should remain on desk duty at the GLRFTF. (*Id*.; Doc. 48-1, Ex. Group E-mails No. 1.)

On July 26, 2010, OIG officially confirmed in a memorandum that it intended to investigate the Linder matter. (*Id*. at 42; Doc. 48-1, Ex. OIG July 26, 2010 Notice.) Kimberly Thomas,[8] the Assistant Special Agent in Charge of OIG in Chicago, testified that Senior Special Agent Kevin Shirley was assigned to the Linder investigation. (Tr. at 87.)

On July 30, 2010, Shirley contacted McPherson. (*Id*. at 218-19.) Shirley immediately questioned McPherson about the interview of Linder that he had conducted eighteen days earlier. (*Id*. at 728.) Shirley was also informed that McPherson had sent out two Marshal Service employees to interview Solis, Linder's alleged victim. (*Id*. at 743.) Shirley requested and

---

[8]

The Government called Thomas as its second witness. Thomas did not participate in any investigative interviews and has no first-hand knowledge of the allegations in this case.

received Walenda's Report of Investigation of Solis.[9]  (*Id*. at 726; Doc. 48-1, Ex. Walenda June 13, 2010 Report of Investigation.)   In addition, Shirley requested and received O'Malley's Report to Internal Affairs, (Doc. 48-1, Ex. O'Malley July 14, 2010 Report), the photographs that Banos took of Solis, (Doc. 48-1, Ex. Banos Aug. 30, 2010 E-mails and Attachments), and an e-mail from Banos containing the contents of a confidential text message conversation between Banos and Linder, (Doc. 48-1, Ex. Banos Aug. 25, 2010 E-mail), among other things.  (*Id*. at 726, 742, 746, 749.) Shirley testified that both O'Malley and Farrell told him that Linder was not advised that the interview was voluntary.  (*Id*. at 733-34.)

On August 5, 2010, Robinson, following the directions of his superior, McPherson, sent an e-mail to Linder pulling him off of a judicial security detail that had been assembled to protect a Justice of the Supreme Court of the United States, and ordering him to meet with McPherson on August 6, 2010.  (Tr. at 228-31, 372.)  This action was "out of the ordinary" because of the extensive advance security measures taken to protect members of the judiciary and the sudden loss of a member of the security team.  (*Id*. at 372.)  Smith testified that "for security purposes, we do an extensive advance of what the Justice is going to do while he's in Chicago.  So it's important that with the advance team that we go through everything.  We meet extensively at the venues that we're going to go.  So when we lose a member of the team, it's significant."  (*Id*. at 371.)

Shirley tried to conduct an interview of Linder on August 6, 2010.  (*Id*. at 774, 778.) Shirley first contacted Honaker in the Marshal Service's office of Internal Affairs to advise him that he was going to be at the Marshal Service's office in the District and that he was going to

---

[9]

Shirley misidentified the author of the Report of Investigation as Banos in his testimony.  (Tr. 726.)

attempt a voluntary interview of Linder.  (*Id*. at 774-75.)  Shirley also informed McPherson that he wanted to conduct an interview of Linder.  (*Id*. at 130.)  He then notified Honaker and McPherson, either by e-mail or by telephone call, that he was coming to the District office of the Marshal Service.  (*Id*. at 775.)  According to McPherson, Shirley contacted him to set up an interview with Linder.  (*Id*. at 130, 779.)  Shirley testified that he solicited McPherson to assist him in obtaining a confession from Linder.  (*Id*. at 785.)  Shirley gave McPherson special instructions not to tell Linder that Shirley and another OIG agent, Jill Semmerling, were coming to interview Linder.  (*Id*. at 130, 779, 782) ("Q: What exactly did you say to [the Marshal]?  Shirley: Please do not advise Mr. Linder that he would be meeting with the OIG.").  Following Shirley's directions, McPherson did not tell Linder what the purpose of the meeting was.  (*Id*. at 231.)  Semmerling was required to attend the interview because OIG procedures require two agents to be present during interviews.  (*Id*. at 88.)

In Robinson's e-mail of August 5, 2010, in which he had informed Linder that he was pulling him from his detail on August 6, 2010, he instructed Linder to meet McPherson at 10:00 a.m. on that day, on the 24th floor of the Dirksen Federal Courthouse.  (*Id*. at 776-78; Doc. 48-1, Ex. Robinson August 5, 2010 E-mail.)  Meanwhile, Shirley and Semmerling had concealed themselves in an office provided to them by McPherson that is about a one minute walk from McPherson's office on the same floor of the Dirksen building.  (Tr. at 130-31, 781.)  At the hearing, Linder's counsel asked Shirley: "You didn't want to give Linder a heads up, that you were going to pretty much surprise him and try to interview him?"  (*Id*. at 779.)  To which Shirley answered simply: "Yes."  (*Id*.)  Shirley testified that everybody he interviewed during the course of the Linder investigation was notified in advance, with the exception of Linder himself.  (*Id*. at 781.)

On August 6, 2010, Linder met McPherson at 10:00 a.m. on the 24th floor of the Dirksen building as instructed, and McPherson immediately told Linder: "Here, come with me." (*Id*. at 232.) McPherson led Linder to the office in which Shirley and Semmerling were waiting, opened the door, indicated that Linder should enter, and then quickly closed the door, turned away, and left Linder alone with Shirley and Semmerling, the investigating agents. (*Id*. at 130-31, 233, 782.) Shirley and Semmerling were standing with their arms outstretched holding their badges and credentials. (*Id*. at 783.) They identified themselves to Linder and advised him that they were investigating a claim of excessive force. (*Id*.) Shirley then provided Linder with a voluntary interview form. (*Id*.) The OIG agents, Shirley and Semmerling, proceeded to attempt an interview of Linder. (*Id*. at 783.) Linder decided to call an attorney, who spoke with the OIG agents and asked a question or two. (*Id*. at 784.) Ultimately, the interview did not go forward. (*Id*.) McPherson took all of the actions described above in the pursuit of obtaining a voluntary interview from Linder because Shirley directed him to and he was merely following Shirley's directions. (*Id*. at 131, 235.)

On August 25, 2010, Banos sent an e-mail to Shirley containing a private text message conversation between himself and Linder. (Doc. 48-1, Ex. Banos August 25, 2010 E-mail.) On August 30, 2010, Banos sent three e-mails to Shirley containing the eleven photographs of the alleged victim, Solis, which he had taken at the Marshal Service management's direction on July 14, 2010. (Doc. 48-1, Ex. August 30, 2010 E-mails and Attachments.)

On September 27, 2010, Linder's Blackberry was seized at the direction of Shirley. (Tr. at 133, 787, 791.) The OIG wanted Linder's Blackberry seized because the OIG agents investigating the case believed that it contained incriminating evidence that could be used against Linder based on information reported to them by DUSM Sims, and therefore the OIG

wanted to search the Blackberry. (Tr. 132-33, 248, 350.) McPherson testified that on September 24, 2010, Shirley contacted him because he wanted to seize Linder's Blackberry in order to search it for evidence. (*Id*. at 132-33, 242.) The Blackberry was owned by the Marshal Service. (*Id*. at 132.) McPherson contacted the Office of General Counsel ("OGC") about whether Linder's Blackberry could lawfully be confiscated by the Marshal Service, and the OGC confirmed that it was appropriate. (*Id*. at 133.) Furthermore, OIG agents have the authority to take possession of property that is issued by the subject agency, here the Marshal Service. (*Id*. at 85-86.) Shirley initiated the process of seizing the Blackberry by notifying Honaker in the Marshal Service's office of Internal Affairs that he intended to confiscate Linder's Blackberry. (*Id*. at 785-86.) Shirley then e-mailed McPherson and Honaker specific and detailed instructions as to how he wanted McPherson to confiscate the Blackberry from Linder's possession. (*Id*. at 791; Doc. 48-1, Ex. Group E-mails No. 3.) Shirley wrote:

> Mr. McPherson: Per my telephone conversation with you yesterday, I will be arriving at your office at 9:30 a.m. for Linder's government-issued phone. Linder will be instructed by the Marshals Service to turn in his government-issued cell phone and the current password for the cell phone to the Marshals Service. The Marshals Service will then, in turn, transfer custody of the cell phone to OIG. Linder should not be informed that he is turning in his government-issued cell phone until he is in the presence of the Marshals Service representative. If Linder does not bring the cell phone with him when he's summoned by the Marshals Service, he should be escorted to the area that the cell phone is located. We would ask that no one in your office be informed of Linder turning in his cell phone until the transfer has occurred due to Linder's personal relationship with management officials within the Marshals Service. If you have any further questions, you may contact me via cell phone [number given] at any time or Senior Inspector Jeremy Honaker.

(Tr. at 787; Ex. Group E-mails No. 3.)

Throughout the hearing, Shirley expressed his belief that "[a]lmost every supervisor in the Chicago area" had a personal relationship with Linder, and that "they would give confidential or sensitive information to Linder." (Tr. at 787-88.) Upon further questioning,

Shirley admitted that McPherson did not have such a personal relationship with Linder, but he testified that he believed that O'Malley, Grunwald, Farrell, Block, Robinson, Travis Huke, and others did have this kind of personal relationship with Linder. (*Id.* at 788.) Shirley felt that these Marshal Service management officials "were trying to sabotage [the] investigation." (*Id.* at 789.) No facts to support such a conclusion were presented in either testimony or other form by the government at the hearing.

After receiving the instructions from Shirley regarding Linder's Blackberry, McPherson decided not to take the Blackberry from Linder personally. (*Id.* at 245.) Instead, McPherson delegated the responsibility of seizing Linder's Blackberry to O'Malley and Robinson. (*Id.* at 133, 245-46, 329.) McPherson called O'Malley into his office where OIG agents Shirley and Semmerling were present and told O'Malley that he was to take custody of Linder's Blackberry and then turn it over to the OIG agents. (*Id.* at 330.) While he was participating in the seizure of the Blackberry, McPherson testified that he was aware that it contained evidence that could be used against Linder. (*Id.* at 134, 248.) He became aware of this from Sims. (*Id.* at 135, 248.) Linder was called into O'Malley's office, whereupon Linder was told by O'Malley and Robinson to turn over his Blackberry. (*Id.* at 791-92.) Shirley and McPherson waited together in McPherson's office while O'Malley and Robinson procured the Blackberry. (*Id.* at 329-30, 792.) After confiscating it from Linder, O'Malley delivered the Blackberry into Shirley's custody in O'Malley's own office. (*Id.* at 332.)

Shirley also communicated with McPherson and Honaker concerning the OIG taking possession of Sims's cell phone. (*Id.* at 248-49.) Shirley provided McPherson with specific and detailed instructions regarding how the OIG wanted McPherson to obtain Sims's phone. (*Id.*) McPherson also delegated this assignment to either O'Malley or Robinson. (*Id.* at 249.) Shirley

further directed McPherson and Honaker about producing documents and records for him. (*Id*. 249-50; Doc. 48-1, Ex. Group E-mails No. 5.)

Shirley made "a lot" of inquires of McPherson with respect to the scheduling of witnesses. (*Id*. at 738.) Shirley gave McPherson notice whenever he wanted to interview a certain individual employed by the Marshal Service. (Tr. at 125-26.) Shirley sent McPherson an e-mail stating: "If you decide that you would like to notify the individuals in question of the pending interview, I would ask they be notified separately and not informed of any other individual who may be interviewed." (*Id*. at 241.) Shirley would provide a time to McPherson so that he could make sure that he had enough resources available to cover the times that Shirley wanted to speak with a witness employed by the Marshal Service. (*Id*. at 126.) On certain occasions, Shirley contacted McPherson for the purpose of setting up interviews of individuals working under McPherson's command. (*Id*. at 240.) Shirley granted McPherson the discretion to tell all of his subordinates, with the exception of Linder, that the purpose of these meetings was to be interviewed by OIG agents. (*Id*. at 240-24; Doc. 48-1, Ex. Group E-mails No. 2.) Shirley testified that he had a "large number" of telephone calls and "several" meetings on "multiple occasions" with the Marshal Service in the District. (Tr. at 762, 764.) Shirley gave McPherson special instructions with respect to his interview of Linder as compared to other witnesses. (*Id*. at 241.)

McPherson could not put a number on how many telephone calls he had with Shirley. (Tr. at 256.) Shirley testified that he had "numerous contacts" with McPherson, and estimated that they had over 30 telephone calls. (*Id*. at 738.) McPherson could not come up with a rough estimate of the number of e-mails he exchanged with Shirley. (*Id*. at 257.) McPherson estimated that he met with Shirley in his office approximately five to ten times. (*Id*. at 257-58.)

Shirley testified that he could not recall the number of meetings he had with McPherson, (*id*. at 757), nor the number of times he was in McPherson's office, (*id*. at 758).

Shirley also met McPherson in several places other than his office, including in the back of a courtroom, (*id*. at 759), in the cafeteria on the second floor of the Dirksen Federal Courthouse, (*id*. at 796), in a room behind one of the courtrooms, (*id*.), and outside the Dirksen building at sporting events involving their children, (*id*. at 761).

Throughout the OIG investigation, complaints occurred from deputies regarding Shirley's behavior and in response Shirley complained to McPherson about tension and division within the Marshal Service in the District over the Linder case. (*Id*. at 137-39.) According to McPherson, Shirley complained that he was "not having any success" with the voluntary interviews he was trying to conduct of Marshal Service personnel. (*Id*.) Shirley admitted to McPherson that he was having issues with speaking to witnesses and that witnesses felt as if they were being retaliated against and intimidated. (*Id*. at 137.) Shirley also came to the Marshal's office to express concern about what was being said to the deputies and Marshal Service personnel in the District. (*Id*. at 253.) Throughout the investigation, individual witnesses felt like they were being singled out, ostracized, and retaliated against due to the investigation of Linder. (*Id*. at 255.) In addition, witnesses, including Sims, DUSM Sean Malecha, DUSM Erick Brown, and Zitsch brought complaints to McPherson directly about the investigation. (*Id*. at 251-52.) McPherson testified that: "[Shirley] just explained a concern that I should have over the district and the division and people feeling like they were being retaliated against and they were intimidated about coming forward and even speaking with him." (*Id*.)

On a separate occasion, Shirley sought to include McPherson in a meeting with the prosecutors assigned to the case, Assistant United States Attorneys Aegean Cha and Mark

Blumberg, to address these concerns. (*Id*. at 139.) Shirley e-mailed McPherson about the proposed meeting, writing: "A situation has come up in regards to the Linder investigation and myself and two prosecutors from D.C. would like to discuss this with you personally." (*Id*. at 253-54; Doc. 48-1, Ex. Group E-mails No. 6.) McPherson agreed to meet with them in his office sometime around May of 2011, which was right in the middle of the investigation of Linder. (Tr. at 139.) Cha and Blumberg, along with Shirley, met with McPherson in his office and discussed the way in which certain Government witnesses were allegedly being intimidated about the Linder case by Marshal Service management officials. (*Id*. at 140, 798-99.) The Assistant United States Attorneys conveyed the same concerns that Shirley had previously expressed to McPherson. (*Id*. at 254.) Shirley testified that he believed Farrell and Grunwald "were the two main individual managers who were harassing the witnesses." (*Id*. at 799.) Although he provided no factual specifics, Shirley stated that he had instructed McPherson on how to proceed in several areas during the investigation, and that McPherson followed all of Shirley's instructions. (*Id*. at 828.) Shirley further testified that McPherson never once said "no" to him, or refused to comply with any of his requests. (*Id*.)

On January 12, 2012, a four count indictment against Linder was returned by the Grand Jury. (Doc. 1, Indict.) McPherson sought guidance from the Office of General Counsel on how best to handle the public indictment and how best to give guidance to his staff. The OGC provided McPherson with the wording of an e-mail to send to all deputies and other Marshal Service personnel in the District regarding "specific rules" for dealing with, among other things, Linder, his legal counsel, and his investigator, as well as the Government. (Tr. at 261; Doc. 48-1, Ex. McPherson Jan. 13, 2012 E-mail.) This being a unique situation, McPherson testified that he contacted the Office of General Counsel ("OGC") and that the OGC had crafted these specific

rules and sent them to McPherson, who proceeded to forward them on to all Marshal Service deputies and Marshal Service personnel within the District. (Tr. at 146-47.) McPherson testified that he had asked OGC for guidelines to help continue the day-to-day operations of the Marshal Service in the District; he didn't tell OGC anything about what the content should be. (*Id*. at 146.) McPherson testified that given the disruptions to the operations of the Marshal Service leading up to the Indictment, he wanted some kind of formal guidance so that the Marshal Service would not have questions as to what they should or should not be doing. (*Id*.)

The e-mail that McPherson sent to all Deputy Marshals and Marshal Service personnel within the District did not indicate that it was drafted by the OGC or otherwise derived from the OGC; rather it gave the appearance of coming directly from the Marshal. (*Id*. at 262.) The e-mail stated that there were "specific rules that must be adhered to" during the criminal proceedings against Linder. (*Id*. at 262-63.) McPherson conceded that the Deputy Marshals and other Marshal Service personnel would interpret the rules as a command from the Marshal, (*id*. at 263), and that they would be expected to follow them. (*Id*. at 264.) McPherson's e-mail stated:

> Below are specific rules that must be adhered to by Marshal Service employees during the pendency of federal criminal proceedings against a DUSM from our district, including rules that outline certain limitations on Marshal Service employees with said DUSM.
>
> \*\*\*
>
> Any contact with prosecutors and investigators involved in the case must be handled in a polite, professional, and appropriate manner.
>
> \*\*\*
>
> Marshal Service employees may not discuss any Government information or any matter about the case with DUSM Linder or anyone else except as authorized or as a matter of official duty.
>
> \*\*\*

> Marshal Service employees must limit their personal contact and socialization with DUSM Linder to not create any appearance of the above.

***

> Marshal Service employees may not discuss the case with DUSM Linder's attorneys or associates except after notifying management and receiving authorization.

(Doc. 48-1, Ex. McPherson Jan. 13, 2012 E-mail.)  The reference to "prosecutors" pertained to Assistant United States Attorneys Cha and Blumberg, and the reference to "investigators" pertained to Shirley, among others.  (Tr. at 264.)  O'Malley testified that the e-mail "went out to the whole district, at one time," and that he received the e-mail just like everyone else in the District.  (*Id*. at 337.)  After sending out this first e-mail to all Marshal Service personnel, no one sought permission from management to speak with Linder or his legal counsel.  (*Id*. at 274-75.)

After being indicted on federal charges, Linder retained an investigator, James Delorto, a retired federal agent, who tried to contact eight Deputy Marshals, as well as McPherson, as part of Linder's defense investigation.  (Doc. 48-1, Ex. Delorto Contact Report.)  In his telephone calls, Delorto identified himself, stated the purpose of the call, and informed the recipient of the call of the fact that he was working for Linder and Linder's counsel.  (Tr. at 290-91.)

McPherson did not answer Delorto's telephone call and did not call him back.  (*Id*.)  McPherson never spoke to Linder's attorneys or investigator, and has not spoken to Linder since the Indictment was returned by the Grand Jury.  (*Id*. at 291.)  By contrast, McPherson met with the Assistant United States Attorneys on at least two occasions and had numerous contacts with Shirley, a Department of Justice investigator.  (*Id*. at 139-40, 253, 256-58, 296.)  McPherson testified that he did not return Delorto's telephone call because he wanted to "remain neutral."  (*Id*. at 162, 291.)

On February 2, 2012, a second e-mail was dispatched from the Marshal's office. (Doc. 48-1, Ex. McFarden February 2, 2012 E-mail.) This e-mail was sent by McPherson's Assistant Chief Deputy, Tim McFarden, who sent the proposed e-mail to McPherson prior to sending it to all deputies and other Marshal Service personnel within the District. (Tr. at 278.) McFarden sent out the second e-mail because he had been told there was harassment of witnesses who were cooperating with the Government taking place among Marshal Service personnel in the District. (*Id*. at 298.) O'Malley testified that McFarden "was getting word back that people had questions or that they were, you know, water cooler talk, chatting about the case, and he felt the need to kind of make it clear what the guidelines were." (*Id*. at 343.) In addition there was "[a] deputy that was on the assignment, we have details and assignments, et cetera, away from the district, on an assignment. He had referenced various individuals in our office, referring to them as I believe rats. And there was a few individuals that were meeting—that had—that had met with the government, so it was. . . a follow-up to an incident that occurred." (*Id*. at 298.) Zitsch testified that "the second e-mail was pertaining to a specific incident that took place[.]" (*Id*. at 637.)

The second e-mail, like the first, did not make any reference to the OGC. (*Id*. at 279.) The McFarden e-mail reads in relevant part:

> It is incomprehensible that I find it necessary to send this e-mail at all, let alone such a short time after the Marshal sent a very forthright, clearly worded e-mail providing guidance on matters involving DUSM Linder and the case that is now being litigated in our District Court. I have copied and pasted the Marshal's e-mail below. Please re-read it carefully. If it is confusing, or you find you need clarification on a particular portion, please ask to meet with me in person. I will answer any questions you have and put out further guidance if I believe it will benefit the situation.
>
> [Marshal McPherson's e-mail]

> If I become aware of behavior that is contrary to the above listed guidance, it will be dealt with through the U.S. Marshals Service's official discipline process and Employee Relations. For your reference, I have attached a Table of Marshal Service and DOJ Offenses. The list is *not* all exhaustive. Please take time to review it.

(Doc. 48-1, Ex. McFarden February 2, 2012 E-mail.) McFarden's e-mail was sent to all Deputy Marshals and Marshal Service personnel under the Marshal's command within the Northern District of Illinois. (Tr. at 277.) O'Malley testified that McFarden's e-mail was "a little stronger," and that the reference to disciplinary processes and criminal offenses in the e-mail caused him some concern and that it was "over the top." (*Id*. at 343-44; Doc. 48-1, Ex. McFarden February 2, 2012 E-mail.) After sending out the second e-mail, no subordinate Marshal Service employee asked management for permission to speak to Linder or his defense team. (Tr. at 281-82.) McPherson expected all Deputy Marshals and personnel in the Marshal Service within the District to follow his orders. (*Id*. at 305.)

On May 17, 2012, four months after the initial e-mail was sent out, McPherson sent a "clarifying e-mail" to all Deputy Marshals and other personnel of the Marshal Service in the District. (Doc. 48-1, Ex. McPherson May 17, 2012 E-mail.) He sent the e-mail in response to receiving information that the first e-mail was causing problems within the Marshal Service—particularly witness intimidation and retaliation issues. (Tr. at 161-62.) This second e-mail was sent out 27 days after Linder's defense counsel filed the present Motion to Dismiss the Indictment alleging that the e-mail was preventing access to witnesses and violating his client's Constitutional rights. (Doc. 26, Def.'s Mot. to Dismiss the Indict.) In addition, the first e-mail had apparently caused confusion among Marshal Service personnel about whether they were permitted to meet with the defense. (*Id*. at 160.) O'Malley testified that this third e-mail clarified information about contact with Linder "during duty hours." (*Id*. at 345.) McPherson

contacted the OCG to help him resolve the problem, and the OCG drafted a clarifying e-mail for McPherson to send to all Marshal Service personnel in the District, after the defense brought the issue to the attention of the Court and the Government by filing the instant motion.  (*Id*. at 283-84; R. 26, Def.'s Mot. to Dismiss the Indict.)  That e-mail was an attempt to clarify the first two e-mails, and reads in relevant part:

> The previous guidelines provided by the district regarding the current Linder investigation stated that "Marshal Service employees may not discuss the case with DUSM Linder's attorneys or associates except after notifying management and receiving authorization."  This e-mail is to clarify that guidance as follows: "Marshal Service employees may not discuss the case with DUSM Linder's attorneys or associates during duty hours except after notifying management and receiving authorization.  Marshal Service employees are reminded that they are forbidden from discussing prisoner security information and Marshal Service investigative techniques at any time without prior authorization from management."

(Doc. 48-1, Ex. McPherson May 17, 2012 E-mail; Doc. 50-1, Gov. Ex. 1, Clarifying E-mail.)

The e-mails sent in 2012 were in stark contrast to the Marshal Service guidance provided to deputies in 2008 when a previous deputy marshal was being investigated.  That deputy, John Ambrose, a former DUSM in the District who is now incarcerated, was indicted on federal charges in 2004. *United States v. Ambrose*, 668 F.3d 943, 948 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 249 (Oct. 1, 2012); (Tr. at 376, 383, 409.)  A number of the deputy marshals who testified were deputies at the time of Ambrose's indictment.  The United States Marshal at that time, Kim Widup, advised all of the Marshal Service personnel within the District that Ambrose remained a Deputy Marshal, notwithstanding the indictment, and that he had not been found guilty of the charges against him, so he was presumed to be innocent.  (*Id*. at 267, 377.)  Smith testified about Ambrose that "[w]e needed to support him, talk to him, and be his friend[.]"  (*Id*. at 377.)  Smith further testified that the e-mails that were sent out regarding the Linder matter by McPherson and McFarden were "definitely concerning" because the Linder case was not "being looked upon

the same way" as the Ambrose case was. (*Id*.) Farrell testified that "[i]t seemed like the Marshals Service had changed its permission" regarding whether Marshal Service personnel could contact Linder, versus the Marshal Service's permission regarding whether Marshal Service personnel could contact Ambrose. (*Id*. at 409.)

Farrell also testified that in the course of the Ambrose investigation there were no guidelines distributed to the Marshal Service personnel like the guidelines that were e-mailed by Marshal McPherson to every member of the Marshal Service in the course of the Linder investigation. (*Id*. at 408.) Farrell stated that "the most important thing is, you know, we all have a responsibility to anyone involved in this case, to check in on their well-being, to make sure they're okay," and it bothered him that he had to scale back on this in dealing with Linder, while, by contrast, he had been able to perform these "responsibilities" with Ambrose. (*Id*. at 409-10.) Farrell testified that in the Ambrose case, the Marshal Service employees got their instructions from Ambrose himself, and that unlike the Linder case, there were no restrictions or limitations on talking to Ambrose. (*Id*. at 410.) Farrell further stated that the directions he received years ago in connection with the Ambrose case were different from the directions he received in the Linder case. (*Id*. at 410.)

DUSM Lorne Stenson testified that he was approached by Linder's counsel in a courtroom in early 2012, and that the attorney stated that he wanted to ask him some questions. (Tr. at 693.) Stenson responded that there was a "standing order" by the Marshal stating that "I could not answer any questions or talk to you or any other third party without getting permission from the U.S. Marshals Service here in Chicago." (*Id*. at 694.) Stenson had received and reviewed the e-mails from both McPherson and McFarden. (*Id*. at 695.) From those e-mails he

understood that he "would be disciplined" if he spoke to the defense without receiving permission from the Marshal. (*Id*. at 694.)

Stenson testified that he was not a friend of Linder's, but that he was a friend of Sims's, the reporting complainant. (*Id*. at 695.) Stenson stated that he had material information about the allegations that Sims had made against Linder. (*Id*.) Stenson testified that Sims had recanted to him the allegations he had made against Linder shortly after he had reported the alleged assault to McPherson. (*Id*. at 695-703.) Among other things, Sims told Stenson: "I jumped the gun. I made a mistake. I should have [taken] the time to file an accurate complete report." (*Id*. at 703-04.) Stenson further testified that Sims told him: "I was scared that if I didn't file it immediately that I would be accused of, myself, of some wrongdoing." (*Id*. at 704.) Finally, Stenson testified that Sims told him that he "felt bad about filing an inaccurate report," and that he "was going to take the initiative to contact the investigators to let them know he made a mistake, that he didn't write a complete and accurate report, and he jumped the gun." (*Id*.)

Stenson did not want to discuss the case with Linder's defense team because of McPherson's e-mail. (*Id*.) Stenson further testified that he would not speak to the defense team, even now, "[u]nless they subpoena me." (*Id*. at 712, 717.) This is because Stenson remains concerned about working with the defense, as McPherson has the power to make determinations about a deputy's career. (*Id*. at 717.) Stenson was also approached for a voluntary interview by Shirley, but he stated that he had retained counsel and declined to be interviewed. (*Id*. at 765, 767.) Stenson told Shirley: "I don't want anything to do with this case." (*Id*. at 767.)

O'Malley testified that minutes after McPherson's first e-mail went out to the entire District he received a call from DUSM George Peters, asking: "What the fuck is this?" (*Id*. at 337, 342-43.) Peters is a very close friend of Linder, and was upset because of the context of the e-mail and his

relationship with Linder. (*Id*. at 342.) O'Malley told Peters that it was "just an e-mail . . . to give some guidelines so [that the Deputy Marshals] know what's going on . . . but it seems to me it's language from General Counsel." (*Id*.) O'Malley also testified that he heard from other supervisors that they had received questions from Deputies trying to obtain clarification of the rules so that they could be understood in plain language. (*Id*. 343.)

Peters testified about receiving the three e-mails, and the fact that he became upset upon reading McPherson's first e-mail. (Tr. at 719.) He testified: "[T]he tone of it seemed as though it was essentially saying that Deputy Linder was guilty[.]" (*Id*.) The first e-mail scared him and made him feel that he would be scrutinized by Marshal Service management for his contacts with Linder. (*Id*. at 721.) The second e-mail had rules of conduct attached to it, which broadened the impact of the first e-mail. (*Id*. at 720.) Peters maintains that he could offer testimony at trial for Linder as a character witness. (*Id*. at 722.)

Farrell, having 16 years of experience with the Marshal Service, is a Supervisory Inspector on the GLRFTF. (*Id*. at 393.) He was surprised by McPherson's e-mail, believing it was unreasonably restrictive, but acknowledging that he had to follow the rules contained therein. (*Id*. at 406.) When he was approached by Linder's counsel for an interview, Farrell stated: "I can't talk to you because of official Marshal policy." (*Id*. at 412.) Farrell's understanding of McPherson's rule regarding contact with Linder's attorney was that he would need to get permission from a supervisor, who would in turn have to get permission from headquarters or the Government's prosecutors. (*Id*. at 413.) Because of this understanding, Linder's attorneys have not been able to interview Farrell. (*Id*.) Farrell interpreted the second e-mail as "strong" and "threatening" because of the references to disciplinary measures. (*Id*. at 415.)

According to Farrell, all GLRFTF members, including local officers, either read or were aware of the e-mails. (*Id*. at 417.) Farrell testified that they believed that if they violated the rules they could be removed from the GLRFTF by Grunwald. (*Id*. at 418.) The officers also believed that they could also lose benefits that they received as a result of working on the GLRFTF, such as overtime, training, vehicles, computers, cell phones, and other benefits. (*Id*. at 419.) Even after receiving the so-called "clarifying e-mail," Farrell refused to be interviewed by Linder's counsel without permission from the Government. (*Id*. at 433.) Farrell supervised Linder on the GLRFTF and would testify that, to his knowledge, Linder never used excessive force. (*Id*. at 457-58.) He was also present when McPherson interviewed Linder and the Government interviewed him on multiple occasions regarding his contacts with Linder on the day of the alleged assault. (*Id*.)

Farrell testified that he was present at the July 12, 2010, meeting held in the Marshal's office in which Linder was questioned by four Marshal Service management personnel. (*Id*. at 395-96.) He testified that McPherson, O'Malley, Block and himself were present at the meeting before Linder was brought in for questioning. (*Id*. at 396.) Everyone in the room had some rank in the Marshal Service or the Investigative Operations Division. (*Id*. at 397.) Farrell testified that there was a conversation among the four participants before Linder was brought in for questioning. (*Id*. at 396.) He testified that "[w]hat I recall is Marshal McPherson brought us into the room. Laid out somewhat of a framework of what we were going to talk to Steve [Linder] about. And they were going to bring him in shortly . . . . The Marshal kind of said we were going to ask Steve [Linder] questions in general about what happened, at which point I said are you sure we can do that? And he replied yes—and I said do we need to advise him of his *Kalkine* rights? And he said no, I spoke to Internal, and they said we could ask him questions in

general . . . . At which point after I talked about what I said that I recall, Matt handed me the written form of the complaint or alleged allegation. I'm not sure what it was. I started skimming it. They sent Matt out to get Steve [Linder]. And I didn't get to finish it." (*Id*. at 397-99.) Farrell testified that after being brought into the Marshal's office, Linder was asked questions; "the majority of the questions were asked by Marshal McPherson, . . . Chief O'Malley . . . may have interjected once or twice. But I would say the lion's share was by Marshal McPherson." (*Id*. at 399-400.) Farrell did not ask any questions, largely because he was "concerned that we should have read him his rights," particularly his *Kalkine* rights. (*Id*. at 398, 400.) Farrell further testified that "the extent of the questions were, you know, kind of tell me what happened that day or what happened on the day of the alleged accusation. And Steve [Linder] responded." (*Id*. at 401.) Everyone "in the room understood that this was coming from another deputy . . . [a]nd that deputy had made some allegations that Steve [Linder] assaulted by physical means a civilian witness[.]" (*Id*. at 401-02.) During the meeting there came a time when Linder asked if he needed legal counsel. (*Id*. at 403.)

Shirley approached Farrell to conduct an interview of him, but Farrell initially refused to submit to a voluntary interview with Shirley. (*Id*. at 767.) Ultimately, Farrell agreed to be voluntarily interviewed by Shirley and the Assistant United States Attorneys in the presence of his attorney. (*Id*. at 767-68.) Shirley testified that during Farrell's interview, Farrell mentioned that he had information on his cell phone that he was not going to share with the Government. (*Id*. at 806.) Shirley immediately got on the telephone during a break in the middle of Farrell's interview, while Farrell was conferring privately with his counsel, to inform Honaker at the Marshal Service's office of Internal Affairs that he was going to take Farrell's cell phone. (*Id*. at 805-07.) Blumberg took the cell phone from Farrell and did not return it to him. (*Id*. at 808.)

Farrell testified that during the Government's investigation, both Shirley and the Assistant United States Attorneys intimidated, threatened, and made misrepresentations to him. (*Id*. at 422-28.) Farrell stated that if he were subpoenaed by the defense, he could serve as a character witness for Linder at trial. (*Id*. at 458.)

Inspector James Smith has been with the Marshal Service for 25 years, and during that time he has worked with Linder. (*Id*. at 370-71.) Smith works in the Judicial Security Division of the Marshal Service, where he acts as a liaison to the Unites States Court of Appeals for the Seventh Circuit, providing them security. (*Id*. at 370-71.) The Judicial Security Division also provides security for Justices of the Supreme Court of the United States when they travel within the District; the Division also handles security for judicial conferences, meetings, and does courtroom assessments. (*Id*. at 371.) Smith is a friend of Linder's, who has worked for him on "three to four [security] details." (*Id*. at 371, 382.) Smith has "tried to support him" throughout the investigation, and has had discussions with Linder about the case. (*Id*. at 382, 387.) Smith assured the Court that neither his friendship nor his working relationship with Linder were affecting his testimony at the hearing. (*Id*. at 389.) Smith received the e-mails from McPherson and McFarden and found them to be "concerning." (*Id*. at 376.) Smith testified that he had not seen or heard of anything like those e-mails in his entire 25-year career with the Marshal Service. (*Id*. at 373, 376.) Smith was concerned about the threat that violations of the rules could cause problems for him personally and professionally. (*Id*. at 377.) Smith discussed the Linder case and the e-mails with different deputies because they were voicing concerns about the e-mails to him. (*Id*. 375, 378.) Smith testified that certain deputies felt intimidated and fearful about maintaining a relationship with Linder because of "the edict sent out by the management team." (*Id*. 378, 380.) Smith stated that: "deputies from the district that have worked for me on

protection details have voiced concerns about … reaching out to Steve or trying to talk to him in any manner because of the—e-mails. I think they felt somewhat intimidated or fearful of trying to be his friend or reach out to him. . . . I think [they] have been afraid to have a relationship with Steve [Linder] because of the e-mails." (*Id*. at 378.) The second e-mail was even more surprising to Smith because it referenced federal offenses, which came attached to the e-mail, for violating the rules that the Marshal had e-mailed to everyone in the Marshal Service in the District. (*Id*. at 382.) Smith testified that various deputies voiced concerns to him about Linder and the e-mails, but that he was not comfortable disclosing the names of any of those deputies to the Court at the evidentiary hearing because he didn't want any of them to "be impacted by the Marshals Service" or retaliated against in any way because "they're not supposed to have contact with Steve [Linder]." (*Id*. at 380.) He further testified: "I think people were concerned because of the—the edict sent out by the management team. . . . Whether or not [a DUSM] had evidence or not, they were—they were concerned about coming forward, no matter what, if they were reaching out to Steve or not. . . . I said there was a concern of the deputies that have worked for me about talking about the case at all. . . .They were just afraid to talk about the case." Smith stated that he could and would testify for Linder as a character witness at trial. (*Id*. at 380-81.)

Detective John Hadjioannou, of the Berwyn Police Department and a member of the GLRFTF, is a percipient witness to the alleged assault of July 8, 2010, as he was present at the scene that forms the basis of the charge alleged in Count I of the Indictment. (*Id*. at 531.) He has been interviewed by the Government twice, once by Shirley and another agent, and once for several hours by Shirley, Cha and Blumberg. (*Id*. at 532-33.) Linder's attorneys attempted to contact Hadjioannou more than once about Linder's case. (*Id*. 535.) Hadjioannou has not spoken with Linder's counsel, and has refused to speak with the defense, because his team

leaders on the GLRFTF informed him of McPherson's e-mails and because of the intimidating manner in which he was treated by Shirley and the Assistant United States Attorneys. (*Id*. at 537, 540-41.) Hadjioannou has seen the e-mails because they were printed out and accessible at the GLRFTF office. (*Id*. at 541-42.) He testified that because of the e-mails: "I don't want to get involved with this case." (*Id*. at 542.) He further testified that he "didn't want to be thrown off the Task Force for doing something that other U.S. Marshals were actually told not to do." (*Id*. at 543.)

Hadjioannou testified that he has information that could benefit Linder at trial. (*Id*. at 562.) The information that Hadjioannou has is important to the underlying facts of the case, yet he feels that he has been hampered in communicating that information to the defense in part due to the intimidation by Shirley and in part due to the e-mail from the Marshal. (*Id*.). The Court even questioned Hadjioannou on the subject: "The Court: Do you have information that you think that you have not conveyed to the Government that would be beneficial to Mr. Linder? Hadjioannous: Yes." (*Id*. at 565.) Shirley intimidated Hadjioannou and indirectly impacted his decision not to speak with the defense. (*Id*. at 564-65.) Hadjioannous testified that Shirley was "intimidating" during their interview. (*Id*. at 537.) Shirley threatened him that he would be the target of an investigation if he was not cooperative. (*Id*. at 539.) Cha and Blumberg made him feel like he had received a "beat down" during their interview with him. (*Id*.) They accused him of lying and they threatened him with consequences. (*Id*.)

DUSM Troy Brejc met with Shirley and was interviewed by the Assistant United States Attorneys concerning the events of July 8, 2010, as well as Linder's character. (*Id*. at 667-68.) Brejc also testified before the Grand Jury. (*Id*. at 670.) He was contacted by Delorto, the

defense investigator, but he has not spoken with the defense about the case. (*Id*. at 671.) Delorto

took notes of his calls, he wrote the following about Brejc:

> Troy Brejc: Contacted on 4-13-12 @ 10:09 a.m. . . . Left a voice message identifying myself as James Delorto, a licensed private investigator working on behalf of Mr. Steven Linder and his attorney Mr. Frank Lipuma and requested that return my call . . . At 10:48 a.m. on 4-13-12 Marshal Brejc returned my call and advised me that he is awaiting advice from his union attorney about setting up a meeting with his attorney present and will re-contact me ASAP. He advised that Steve Linder is a good guy and a friend and wants to cooperate as much as possible but at the same time be represented by counsel. On the afternoon of 4-13-12 Troy again called and advised me that he could meet me without his attorney and answer questions about the Linder case . . . On 4-18-12 @ 10:15 a.m. Troy advised me he could talk to me but was reluctant to talk to both me and attorney Frank La Puma [sic] at the same time without his attorney present. I told him I would advise Mr. La Puma [sic] and contact him by phone in a few days.

(Doc. 48-1, Ex. Delorto Contact Report.) Brejc testified that while he wanted to cooperate with

the defense, eventually he "didn't believe [he] was allowed to." (*Id*. at 671-72.) Brejc sought

legal advice because he was scared and felt the need to protect himself. (*Id*. at 684.) Ultimately

he decided not to cooperate with the defense, in part because of the McPherson and McFadden e-

mails. (*Id*. 672-73.) Brejc has also ceased contact with Linder because of the e-mails. (*Id*. 674-

75.) Brejc did not seek authorization from McPherson to speak with Linder or his counsel

because he did not want to deal with the "ramifications." (*Id*. at 685.) He believed that

McPherson and the Marshal Service management generally "were taking a side when they sent

out those e-mails[.]" (*Id*. at 689.)

DUSM Paul Zitsch is also a percipient witness to the events charged in Count I of the

Indictment as he was present at the scene of the alleged assault on July 8, 2010. (*Id*. at 615, 624-

25.) Zitsch spoke with the Government "several" times, met with Shirley and the Assistant

United States Attorneys, and testified before the Grand Jury. (*Id*. at 616-20.) Zitsch drove with

Sims from Cicero, the location of the alleged assault, to the Dirksen Federal Courthouse

immediately after the alleged assault, and yet Sims said nothing about the alleged assault. (*Id.* at 628.) Zitsch testified that in the car ride Sims "said absolutely nothing" about observing Linder assault someone. (*Id.*) Linder contends that this is evidence held by Zitsch that is favorable to him. (Doc. 86, Def.'s Post-Hr'g Br. at 25.) Linder also claims that Zitsch saw the alleged victim without any marks or bruising after the purported assault which is also favorable defense evidence. (*Id.*) Zitsch received and read the McPherson and McFarden e-mails. (Tr. at 635.) He was subsequently contacted by Delorto. (*Id.* at 632-34.) However, he did not feel comfortable returning Delorto's call. (*Id.* at 633.) Zitsch testified that he was obligated to follow the rules set forth by the Marshal. (*Id.* at 636.)

Lieutenant Theodore Stajura, of the Cook County Sheriff's Police Department and a former member of the GLRFTF, is another percipient witness. (*Id.* at 464, 466-67.) He testified that he was on the scene on July 8, 2010, when Linder allegedly assaulted Solis. (*Id.* at 463-67.) Given his rank with the Cook County Sheriff's Police Department, Stajura had supervisory command over 12 officers on the GLRFTF. (*Id.* at 468.) Stajura knew Linder because he served with him on the GLRFTF. (*Id.*) Stajura was interviewed by Shirley and later by the Assistant United States Attorneys, and he testified before the Grand Jury. (*Id.* at 467.) McPherson's e-mail was delivered directly to Stajura's Marshal Service-issued Blackberry. (*Id.* at 485, 492.) Stajura's immediate reaction to the e-mail was to "stay away" from Linder given the "very severe" tone of the e-mail. (*Id.* at 486-87, 512.) Stajura testified that he thought the e-mail basically said to "cease and desist" all contact with Linder. (*Id.* at 488.) Stajura followed McPherson's directive, (*id.* at 486), especially after he asked Farrell about it and Farrell told him to "heed it and listen to it," (*id.* at 488-89).

Stajura, as a supervisor, spoke to the officers under his command on the GLRFTF about the e-mails. (*Id*. at 488.) He told the officers about the rules, which he described as coming from the "highest level," and instructed the officers to limit their association with Linder. (*Id*.) Stajura gave these instructions to at least five officers with knowledge of the events of July 8, 2010, the date of the alleged assault charged in Count I of the indictment. (*Id*. at 490.) While Stajura told his officers to cease contact with Linder, he simultaneously told them that they "had to cooperate with the investigation that was being conducted by Senior Special Agent Shirley." (*Id*. at 494, 509-10.)

Linder's defense team attempted to contact Stajura, but he never spoke to them. (*Id*. at 504.) Stajura did not speak with the defense because he had concerns about meeting with Linder's attorneys because of Shirley's aggressive conduct and the repercussions that might befall him and his officers if he met with any member of the defense team. (*Id*. at 504-05.) Stajura believed that "everything should be coordinated through the government." (*Id*. at 516-17.) Stajura testified that he feared prosecution from Shirley and Cha. *(Id. At 505)*. He also testified about having contact with Linder and that he had "concerns" and "some issues . . . based on the conduct of Special Agent Shirley and how this was playing out that . . . [his] personal belief is there might be some repercussions . . . from Marshals' management if [he] were to cooperate with the defense team." (*Id*. at 504-05.) Stajura followed Shirley's orders and collected documents for Shirley and helped him arrange interviews for the Linder matter. (*Id*. at 501.)

As characterized by Linder, Stajura "also testified about Agent Shirley's rogue conduct." (Doc. 86, Def.'s Post-Hr'g Br. at 26.) Shirley and Stajura had an agreement concerning how Shirley would conduct interviews of sheriff's officers and how he would effect service of

subpoenas on them so that they could be cleared with management in the sheriff's office. (Tr. at 421, 474-75.) However, Shirley subsequently pulled officers off of their job assignments without obtaining Stajura's approval or even giving him notice. (*Id*. at 421, 477-78.) Shirley also violated the agreement by serving officers with subpoenas directly. (*Id*. at 421-22, 476.) Shirley told some officers that they needed to cancel their scheduled work assignments at any given moment in order to meet with him. (*Id*. at 424.) At one point, Stajura discovered an officer, Myron Weres, who had been pulled off his assignment, talking with Shirley and another agent. (*Id*. at 477-78.) Stajura ordered Weres to write a "formal to/from" memorandum "to document his actions" as a consequence for leaving his assignment without Stajura's knowledge. (*Id*. at 479.) Stajura testified that when he attempted to point out Shirley's disruption with his supervisees' work schedule, "Special Agent Shirley got confrontational with me and basically threatened to bring me before the grand jury." (*Id*. at 478-79.) Due to the aggressive nature of Shirley's interaction with his staff, Stajura reported this incident and others involving Shirley to his Chief, Dwayne Holbrooke. (*Id*. at 479-80.)

Another member of the GLRFTF also expressed concern about the aggressive and threatening behavior of Shirley during the investigation. Holbrooke, Chief of Police of Cook County and a member of the GLRFTF, wrote a formal letter of complaint to the OIG and the Department of Justice against Shirley. (*Id*. at 420, 480-81; Doc. 48-1, Ex. Holbrooke Nov. 16, 2011 Letter.) Other GLRFTF members told Farrell that Shirley had treated them in a "heavy-handed" manner. (Tr. at 422.) Grunwald was approached by Shirley to give a voluntary interview, but he declined. (*Id*. at 769-71.) Shirley, therefore, instructed Grunwald to appear at his office on January 19, 2012, at a specified time to sit for a compelled interview conducted by Shirley. (*Id*.) Shirley told Holbrooke that "he owned [Holbrooke's] officers." (*Id*. at 481.) A

couple of officers told Farrell that Shirley had "threatened" them. (*Id*. at 422.) Since the time of these events Holbrooke has retired. (*Id*. at 482.

Shirley testified falsely a number of times during the hearing on this motion. (Doc. 86, Def.'s Post-Hr'g Br. at 27.) For example, Shirley testified that he never shared with McPherson information about whether any witnesses had agreed to be interviewed. (Tr. at 816.) However, an exhibit introduced by the defense establishes that Shirley sent McPherson a courtesy copy of an e-mail in which Shirley explained that Grunwald's interview was being compelled because he had refused to sit for a voluntary interview. (Doc. 48-1, Ex. Group E-mails No. 8.) Shirley also testified that he never discussed with McPherson how to approach a witness. (Tr. at 816.) However, the hearing testimony makes clear that Shirley gave McPherson clear directions on multiple occasions, including about delivering Linder to OIG agents Shirley and Semmerling to be interviewed. (*Id*. at 130.) Shirley further testified that he never discussed the strengths of the case against Linder with McPherson. (*Id*. at 817.) The evidence is to the contrary; Shirley complained to McPherson about "not having any success with" Government witnesses, and he accordingly secured meetings with McPherson to discuss witness participation, including one in which Cha and Blumberg also discussed witness issues with McPherson. (*Id*. at 139-40, 798.)

Cha took over the investigation of this case from another AUSA, Nicole Ndumele, in December of 2010, and Shirley worked in concert with Cha thereafter. (*Id*. at 835-36.) Shirley testified that he was in constant contact with Cha, sometimes communicating with her, either by telephone or e-mail, multiple times a day, nearly every day throughout the course of the investigation. (*Id*. at 821-22, 835.) Cha (or another AUSA) was aware of everything Shirley was doing during the investigation. (*Id*. at 835.)

Linder asserts that he has been prevented from interviewing witnesses. (Doc. 86, Def.'s Post-Hr'g Br. at 28.) Shirley, by contrast, admitted at the evidentiary hearing that he was able to interview everyone he wanted to during the course of the 18-month investigation of Linder. (Tr. at 772, 774.) Although the government admitted that if Shirley could not secure a voluntary interview from a witness, he would force the witness to submit to a compelled interview, it made no effort to interview Stenson, the one deputy with whom Sims discussed the case. (*Id*. at 767, 770; Doc. 48-1, Group E-mails No. 8.) Shirley testified that McPherson did everything that Shirley asked of him in the course of the investigation of Linder and "complied with everything that [Shirley] requested." (Tr. at 828.)

## THE COURT'S POWER TO DISMISS THE INDICTMENT

Article III courts draw their power to dismiss an indictment from three discrete sources. A federal court may dismiss an indictment pursuant to the Constitution, pursuant to the court's supervisory powers, or pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure. *See United States v. Caruto*, 663 F.3d 394, 397 (9th Cir. 2010) (internal citation and quotation marks omitted) (noting that the power of a federal court to dismiss an indictment is derived from "the Constitution, [or] the courts' inherent supervisory powers"); *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000) ("Federal Rule of Criminal Procedure 12(b)(2) authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges."); *United States v. Isgro*, 974 F.2d 1091, 1094 (9th Cir. 1992) ("First, a court may dismiss an indictment if it perceives constitutional error . . . Second, a district court may draw on its supervisory powers to dismiss an indictment."); *United States v. McKenzie,* 678 F.2d 629, 631 (5th Cir. 1982) ("Thus, whether the court is acting under its supervisory authority

or its duty to protect the constitutional rights of defendants, an indictment may be dismissed only where the defendants' case has been unfairly prejudiced."). "While responsibility for keeping federal criminal investigations and prosecutions within the bounds appropriate on the assumptions inherent in a federal system should rest, in the first instance with United States Attorneys under the active guidance of the Attorney General, we are not prepared to say that, absent Congressional limitation, a federal court may never dismiss a prosecution as an abuse of federal power." *United States v. Archer*, 486 F.2d 670, 678 (2d Cir. 1973) (Friendly, J.).

The first source of authority for the federal courts to dismiss an indictment is their power and duty to dismiss an indictment obtained in violation of the Constitution or the laws of the United States. *United States v. Holloway*, 74 F.3d 249, 253 (11th Cir. 1996) (a federal court may dismiss an indictment when it violates the Constitution or laws of the United States); *United States v. Harris*, 832 F.2d 88, 89 (7th Cir. 1987) ("On appeal, [the defendant] asserts that his indictment offends the Double Jeopardy Clause of the federal Constitution because each count of the indictment charges him with the same offense."); *United States v. Hyder*, 732 F.2d 841, 843 (11th Cir. 1984) ("Federal courts possess the power and duty to  dismiss federal indictments obtained in violation of the Constitution or laws of the United States."); *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) ("Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."); *see, e.g.*, *United States v. Thomas*, 534 F. Supp. 2d 912, 915 (N.D. Iowa 2008) *aff'd sub nom. United States v. Howell*, 552 F.3d 709 (8th Cir. 2009) (internal quotation marks omitted) ("The court possesses an inherent power to dismiss federal indictments obtained in violation of the Constitution of the United States."); *United States v. Weekley*, 389 F. Supp. 2d 1293, 1297 n.3

(S.D. Ala. 2005), *aff'd*, 189 F. A'ppx 903 (11th Cir. 2006) ) (internal quotation marks omitted) ("The law is clear that federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."); *In re Grand Jury Proceedings*, 700 F. Supp. 626, 628 (D.P.R. 1988) ("Federal courts have the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."). In other words, dismissal of an indictment may be warranted where the government has committed constitutional error. *United States v. Mills*, 995 F.2d 480, 486 (4th Cir. 1993) ("We review indictments for constitutional error and prosecutorial misconduct."); *Isgro*, 974 F.2d at 1094 (quoting *United States v. Larrazolo,* 869 F.2d 1354, 1358 (9th Cir. 1989)) (internal quotation marks omitted) ("[A] court may dismiss an indictment if it perceives constitutional error[.]").

The second source of authority from which the federal courts draw their power to dismiss an indictment, generally on nonconstitutional bases and usually for governmental misconduct, lies in the courts's supervisory powers. The Supreme Court has long recognized that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution." *Hudson*, 11 U.S. (7 Cranch) at 34. These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962). "In this posture we have then a case that raises not a constitutional question but one concerning our supervisory powers over federal law enforcement agencies." *Rea v. United States*, 350 U.S. 214, 216-17 (1956).

"The court has inherent authority to regulate the administration of criminal justice among the parties before the bar." *United States v. Cortina*, 630 F.2d 1207, 1214 (7th Cir. 1980). The

lower federal courts are creatures of statute. Thus, "the exercise of the inherent power of lower federal courts can be limited by statute and rule." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). "Nevertheless," the Supreme Court has explained, "we do not lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power." *Id.* (internal quotation marks omitted). For Congress to displace or repudiate the lower federal courts's supervisory powers, the Supreme Court has demanded something akin to a clear statement from Congress expressing its intent to do so. *Id.* *See Hobby v. United States*, 468 U.S. 339, 349 (1984) ("At oral argument, petitioner eschewed primary reliance upon any particular constitutional provision and instead invoked this Court's supervisory power over the federal courts as a basis for the relief he seeks."); *Lee v. United States*, 432 U.S. 23, 37 (Marshall, J., dissenting) ("It is apparent to me that this Court has today deliberately passed up an opportunity to exercise its supervisory power to prohibit rather than to condone fundamental errors in criminal procedure."); *United States v. LaMantia*, 59 F.3d 705, 707 (7th Cir. 1995) ("[T]he court's supervisory authority can be used to dismiss an indictment."); *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978) ("Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct.")

The doctrine of the federal courts' supervisory powers, sometimes referred to as the courts' inherent authority, finds its roots as far back as the founding era. *See Hudson,* 11 U.S. (7 Cranch) at 34 ("[O]ur Courts no doubt possess powers not immediately derived from statute."). The "moment the courts of the United States were called into existence and invested with jurisdiction over any subject . . . they became possessed of [inherent] power." *Robinson*, 86 U.S. (19 Wall.) at 510. The supervisory powers of the federal courts, though "not specifically required by the Constitution or the Congress," *United States v. Hasting,* 461 U.S. 499, 505

(1983), are nevertheless "necessary to the exercise of all others," *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). *See also Chambers*, 501 U.S. at 43 (internal citations and quotation marks omitted) ("It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."); *McNabb v. United States*, 318 U.S. 332, 341 (1943) (internal citations and quotation marks omitted) ("Guided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress."); *Williams*, 504 U.S. at 46 (quoting *Hasting,* 461 U.S. at 505) (same); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) (quoting *Hasting*, 461 U.S. at 505) (same); *United States v. Goodson*, 204 F.3d 508, 513 (4th Cir. 2000) (quoting *Hasting*, 461 U.S. at 505) (internal quotation marks omitted) ("[T]he court may have been relying on its general supervisory power to administer its docket and preserve the integrity of the judicial process. A court's supervisory power authorizes it to formulate procedural rules not specifically required by the Constitution or by Congress."). In the words of the Seventh Circuit, "[t]he 'supervisory power' of the federal courts is a power to formulate rules of the common law when neither Constitution nor statute supplies a rule of decision." *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir. 1986).

There are three purposes underlying the federal courts' use of their supervisory powers: the first is to implement a remedy for the violation of recognized rights; the second is to preserve the integrity of the judicial system by ensuring that a conviction rests on appropriate considerations validly before a jury; and the final purpose is to provide a remedy designed to deter illegal conduct. *Hasting*, 461 U.S. at 505. "[G]iven the constitutionally-based

independence of each of the three actors—court, prosecutor and grand jury—we believe a court may not exercise its 'supervisory power' in a way which encroaches on the prerogatives of the other two *unless there is a clear basis in fact and law for doing so*. If the district courts were not required to meet such a standard, their 'supervisory power' could readily prove subversive of the doctrine of separation of powers." *Chanen*, 548 F.2 at 1313 (emphasis supplied). As one commentator has observed, "[t]he judicial temptation to supervise [prosecutors] is powerful. It seems so natural: judges are more experienced, more dispassionate, better able to weigh the investigators' legitimate interests against principles of fairness and, presumably, wiser. . . . [*United States v. Ming He*[10]] demonstrates the increasing pressure judges feel to take back, or at least balance, some of the power that has been vested in the executive branch." Gleeson, "Supervising Criminal Investigations: The Proper Scope of the Supervisory Power of Federal Judges," 5 J.L. & Pol'y 423 (1996-1997).

The third source of authority from which the federal courts draw their power to dismiss an indictment emanates from Rule 12(b) of the Federal Rules of Criminal Procedure, which allows for the consideration by this Court, at the pretrial stage, of "any defense, objection, or request that the court can determine without a trial of the general issue. . . . that [a] party may raise by pretrial motion." Fed. R. Crim. P. 12(b)(2). A motion to dismiss an indictment usually can be determined without a trial. *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir. 1993) ("A motion to dismiss is generally capable of determination before trial."); *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (internal quotation marks omitted) ("A pretrial motion is generally capable of determination before trial[.]"); *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976) ("[Federal Rule of Criminal Procedure 12(b)] was written to

---

[10]   94 F.3d 782 (2d Cir. 1996).

encourage the making of motions prior to trial."). Pursuant to the Federal Rules of Criminal Procedure the following must be raised prior to trial: "(A) a motion alleging a defect in instituting the prosecution; (B) a motion alleging a defect in the indictment or information. . . ." Fed. R. Crim. P. 12(b)(3)(A) and (B); *see generally United States v. Rodriguez*, 738 F.2d 13, 15 (1st Cir. 1984).

Rule 12(b)(1) of the Federal Rules of Criminal Procedure permits a defendant to raise a motion to dismiss an indictment based on defects in the prosecution of the indictment after it is returned but before trial on the merits. *Deaver v. Seymour*, 822 F.2d 66, 70 (D.C. Cir. 1987) (Silberman, J.). "Moreover, district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992). Federal Rule of Criminal Procedure 12(b) allows that a pretrial motion to dismiss an indictment is well-taken where the government, as a matter of law, is incapable of proving beyond a reasonable doubt the charges against the defendant, or where the government has violated the defendant's constitutional rights or has committed constitutional error in the prosecution of the indictment. *Id*. at 468. Rule 12(b) of the Federal Rules of Criminal Procedure "serves the salutary purpose of preventing unnecessary trials and deterring the interruption of a trial on the merits for any objection relating to the institution and presentation of the charge," such as a motion to dismiss an indictment. *Sewell v. United States*, 406 F.2d 1289, 1292 (8th Cir. 1969).

In *Russell,* 411 U.S. at 432, the Supreme Court recognized "a situation in which the conduct of law enforcement agents is so outrageous that due process principles would *absolutely bar* the government from invoking judicial processes to obtain a conviction." (internal citation

omitted) (emphasis supplied). The Court acknowledged that such conduct by law enforcement would violate that "fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment." *Id*. (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246 (1960)) (internal quotation marks omitted). Although the *Russell* Court did not provide a context in which to clarify the level of outrageousness that would be necessary to trigger the protections of the Fifth Amendment, the Court made it clear that a defendant asserting such outrageous conduct must show actual prejudice to warrant the dismissal of an indictment with prejudice. *Russell*, 411 U.S. at 432; *United States v. Morrison*, 449 U.S. 361, 364-66 (1981).

Unlike in a civil action, a grand jury indictment is generally not subject to dispositive motion practice, and the remedy of dismissal is rarely invoked because it is deemed to be extraordinary. *United States v. Li,* 206 F.3d 56, 62 (1st Cir. 2000) (quoting *United States v. Stokes,* 124 F.3d 39, 44 (1st Cir. 1997)) (internal quotation marks omitted) ("Because the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step."); *see, e.g.*, *United States v. George*, 839 F. Supp. 2d 430, 435 (D. Ma. 2012) ("In contrast to civil actions, an indictment generally is not subject to dispositive motion practice."); *United States v. Goodrich*, 804 F. Supp. 2d 64, 67 (D. Me. 2011) (same); *United States v. Cameron,* 662 F. Supp. 2d 177, 179 (D. Me. 2009), *aff'd*, 699 F.3d 621 (1st Cir. 2012) (same). In the ordinary course of a federal criminal prosecution, a facially valid indictment returned by a properly constituted grand jury generally calls for a trial on the merits. *Costello*, 350 U.S. at 363-64 ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."); *United States v. Wills*,

346 F.3d 476, 488-89 (4th Cir. 2003) (same); *United States v. Reyes-Echevarria*, 345 F.3d 1, 5 (1st Cir. 2003) (same); *United States v. Short*, 671 F.2d 178, 181 (6th Cir. 1982) (same). Nevertheless, dismissal of an indictment may be used "to insure proper standards of conduct by the prosecution." *United States v. Pino*, 708 F.2d 523, 530 (10th Cir. 1983).

"[D]ismissing an indictment is an extraordinary step," *Li,* 206 F.3d at 62, because by returning an indictment, the grand jury is carrying out a constitutionally prescribed function enshrined in the Bill of Rights. *See* U.S. Const., amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."). Furthermore, because of the "necessity for preserving society's interest in the administration of criminal justice," dismissing an indictment is an infrequently utilized remedy in the arsenal of the federal courts. *Morrison*, 449 U.S. at 364 (concluding that the dismissal of an indictment is unwarranted absent a constitutional violation that prejudices the defendant's case). Federal courts are advised to exhibit a modicum of restraint when considering whether to dismiss an indictment because a dismissal encroaches not only upon the fundamental role of the grand jury, but also upon the role of the prosecutor, who is the constitutional actor charged with enforcing federal criminal law within the Executive Department, a coordinate and coequal Department of our government with a degree of constitutionally mandated independence. *See* U.S. Const., art. II, § 3 (The President "shall take Care that the Laws be faithfully executed"); *United States v. Samango*, 607 F.2d 877, 881 (9th Cir. 1979) ("The Court's power to dismiss an indictment on the ground of prosecutorial misconduct is frequently discussed but rarely invoked. Courts are rightly reluctant to encroach on the constitutionally-based independence of the prosecutor and grand jury."). The Executive Department is represented in most criminal litigation by the United States Attorney. "A district judge may not limit the U.S. Attorney's

authority to decisions that garner the support of each law-enforcement agency, or the majority of some committee." *United States v. Zingsheim*, 384 F.3d 867, 872 (7th Cir. 2004) (Easterbrook, J.). *See also United States v. Armstrong,* 517 U.S. 456, 464 (1996) (quoting U.S. Const., art. II, § 3) ("The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"); *Whitehouse v. United States Dist. Court*, 53 F.3d 1349, 1359 (1st Cir. 1995) ("When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury. That power is appropriately reserved, therefore, for extremely limited circumstances."); *United States v. Giorgi,* 840 F.2d 1022, 1030 (1st Cir. 1988) (quoting *United States v. Ogden,* 703 F.2d 629, 636 (1st Cir. 1983)) (internal quotation marks omitted) ("The basic rule is that, because of the constitutionally mandated independence of the grand jury and the prosecutor, courts should be reluctant to dismiss an indictment."). "A dismissal, therefore, will be ordered only for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *Ogden*, 840 F.2d at 1030.

Taking into account these principles and after reviewing the facts and testimony set forth in the hearing and after judging the credibility of the witnesses, this Court finds that this is one of those rare circumstances where the Court must dismiss an indictment due to the Constitutional violations committed and the need to sanction the extreme and damaging conduct which violated Linder's Sixth Amendment right to compulsory process of witnesses and his Fifth Amendment right to due process of law.

## THE LEGAL STANDARD

When considering a motion to dismiss an indictment the Court assumes all of the facts alleged in the indictment as true and views all of the facts alleged in the indictment in the light most favorable to the government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). This Court's findings of fact must be accepted as true unless they can be shown to be clearly erroneous. *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005). Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "The true test of the sufficiency of the indictment is whether it contains the elements of the offense intended to be charged." *United States v. Senak*, 477 F.2d 304, 306 (7th Cir. 1973) (quoting *Hagner v. United States* (1932)) (internal quotation marks omitted). "When grading an indictment's sufficiency, [a court must] look to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." *United States v. Guerrier,* 669 F.3d 1, 3 (1st Cir. 2011). *See also United States v. Locklear*, 97 F.3d 196, 199 (7th Cir. 1996) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (internal quotation marks omitted) ("In general terms, an indictment is sufficient if it first, contains the elements of the charged offense and fairly informs a defendant of the charge against him which he must defend, and second, enables him to plead double jeopardy as a bar to a future prosecution.").

The defendant bears the burden of proving that the government's conduct "interfered substantially with a witness's free and unhampered choice to testify." *United States v. Skilling,* 554 F.3d 529, 567 (5th Cir. 2009), *vacated in part on other grounds*, —U.S.—, 130 S. Ct. 2896 (June 24, 2010). Even if the defendant can satisfy his burden of proving that the government

substantially interfered with a witness's decision to cooperate with the defendant, there can be no constitutional violation unless the defendant can also make some plausible showing that the witness's testimony would have been both material and favorable to the defendant; in other words, that the defendant suffered prejudice as a result of the witness's choice not to cooperate with the defendant. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) ("[R]espondent cannot establish a violation of his constitutional right to compulsory process merely by showing that [the government] deprived him of [witness's] testimony. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense.").

This Court is empowered to dismiss an indictment when it violates the Constitution or laws of the United States, when there has been some constitutional error in the prosecution of the indictment, or subject to a motion pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure. *See DeLaurentis*, 230 F.3d at 660–61 ("Federal Rule of Criminal Procedure 12(b)(2) authorizes dismissal of an indictment if its allegations do not suffice to charge an offense, but such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges."); *Holloway*, 74 F.3d at 253 ("Federal courts possess the power and duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."); *United States v. Van Engel,* 15 F.3d 623, 631-32 (7th Cir. 1993), *abrogated by United States v. Canoy*, 38 F.3d 893 (7th Cir. 1994) ("A federal judge is not authorized to punish the misconduct of a prosecutor by letting the defendant walk, unless the misconduct not only violated the defendant's rights but also prejudiced his defense[.]"); *Mills*, 995 F.2d at 486 ("We review indictments for constitutional error and prosecutorial misconduct."); *United States v. Calzada*, 579 F.2d 1358, 1363 (7th Cir. 1978) (emphasis supplied) ("[W]e cannot say that the

district court erred in finding that the defendants' constitutional rights to compulsory process had been violated, nor that it abused its discretion in concluding that the *only* reasonable remedy for that violation was the dismissal of the indictment."). Furthermore, the Court may dismiss an indictment on other grounds pursuant to its supervisory powers, such as when the government exhibits outrageous misconduct in prosecuting the indictment, causing prejudice to the defendant; such a dismissal is a prophylactic tool used to discourage future deliberate governmental impropriety. *See United States v. Derrick*, 163 F.3d 799, 807 (4th Cir. 1998) ("[A] court's supervisory power cannot be exercised to dismiss indictments for government misconduct absent a showing of prejudice to the defendants."); *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979) (quoting *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978)) (internal quotation marks omitted) ("Under its inherent supervisory powers, a federal court is empowered to dismiss an indictment on the basis of governmental misconduct.").

## ANALYSIS

The Supreme Court of the United States "has had little occasion to discuss the contours of the Compulsory Process Clause." *Penn. v. Ritchie*, 480 U.S. 39, 55-56 (1987). Perhaps the most celebrated, in addition to the first, analysis of the Clause comes from a Virginia federal court in 1807, in the course of the treason and misdemeanor trials of Aaron Burr. Chief Justice Marshall, who presided as the trial judge, ruled that Burr's compulsory process rights under the Sixth Amendment entitled him to serve a subpoena on President Jefferson, requesting the production of allegedly incriminating evidence. *United States v. Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (C.C.D. Va. 1807) (Marshall, C.J.). In ruling for Burr, Chief Justice Marshall declared the Compulsory Process Clause to be "sacred" among the rights of criminal defendants. *Id*. ("[T]he right given by this article *must be deemed sacred by courts*, and the article should be so

construed as to be something more than a dead letter."). Despite the implications and the promise of the *Burr* decision for the direction of federal criminal procedure, the Compulsory Process Clause languished and rarely was employed by the Court over the next 160 years. However, starting during the Warren Court and flourishing during the Burger Court, the Supreme Court began to articulate a number of the specific rights secured by this particular Clause of the Sixth Amendment. The Court has observed, "[o]ur cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Ritchie*, 480 U.S. at 56. *See, e.g.*, *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Cool v. United States,* 409 U.S. 100 (1972) (per curiam); *Webb v. Texas,* 409 U.S. 95 (1972) (per curiam); *Washington v. Texas,* 388 U.S. 14 (1967).

"Th[e] [Supreme] Court has never squarely held that the Compulsory Process Clause guarantees the right to discover the *identity* of witnesses, or to require the government to produce exculpatory evidence." *Ritchie*, 480 U.S. 39 at 56; *but cf. Nixon*, 418 U.S. at 709 (suggesting that the Clause may require the production of evidence). Rather, the Court has traditionally evaluated claims brought pursuant to the Sixth Amendment's Compulsory Process Clause under the broader protections of the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Valenzuela-Bernal*, 458 U.S. at 872 ("Having borrowed much of our reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment, we have little difficulty holding that at least the same materiality requirement obtains with respect to a due process claim."); *see also United States v. Bagley,* 473 U.S. 667, 678, 682 (1985) ("The constitutional error, if any, in this case was the Government's failure to assist the defense by disclosing information that might have been

helpful in conducting the cross-examination. . . . evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *United States v. Agurs,* 427 U.S. 97, 107 (1976) ("We are not considering the scope of discovery. . . . We are dealing with the defendant's right to a fair trial mandated by the Due Process Clause of the Fifth Amendment to the Constitution."); *Wardius v. Oregon,* 412 U.S. 470, 472 (1973) ("We hold that the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants."); *Brady v. Maryland,* 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."). Because the Court's Fifth and Fourteenth Amendment jurisprudence addressing the fundamental fairness of trials establishes a clear framework for review, the Court has adopted a due process analysis for the purposes of Sixth Amendment claims. *Ritchie*, 480 U.S. 39 at 56. "Although we conclude that compulsory process provides no *greater* protections in this area than those afforded by due process, we need not decide today whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment." *Id*.

A defendant's right to present his own witnesses in establishing a defense is a fundamental aspect of due process of law and is strictly protected by the Fifth and Sixth Amendments to the United States Constitution. *Washington*, 388 U.S. at 19 ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to

confront the prosecution's witnesses for the purpose of challenging their testimony he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). This right encompasses a defendant's Sixth Amendment right to compulsory process for obtaining witnesses in his favor. *Id.* at 19-23. "The Supreme Court in *Washington v. Texas* held that the right to compulsory process guaranteed by the Sixth Amendment is a fundamental element of due process of law, and as such *it should be interpreted broadly.*" *Calzada*, 579 F.2d at 1360 (internal citation omitted) (emphasis supplied).

## I.     Whether Marshal McPherson and Those Acting Under His Command Acted as Part of the Prosecution Team

The threshold issue in this case is whether Marshal McPherson, or those acting under his command, can be deemed to have been part of the prosecution team in the Linder investigation. For if McPherson is not held to be a member of the prosecution team, then there is no constitutional violation, and Linder's motion must fail. *See United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) ("Even assuming the reports' materiality, there is no evidence that the prosecution team in the instant case was aware of the reports that have subsequently come to light. . . .[therefore] we hold that the district court did not abuse its discretion in denying the motion for a new trial and the renewed motion for a new trial.").

A prosecutor will be held responsible for the conduct (and misconduct) committed by members of the "prosecution team," as that phrase is defined under federal law. The term "prosecution team" has been broadly construed, and it includes both investigative and prosecutorial personnel. *See United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) (the prosecution team is "the team that investigated [the] case or participated in its prosecution"); *Sargent v. Sec'y, Fla. Dep't of Corrs.*, 480 F. App'x 523, 529 (11th Cir. 2012) (internal quotation marks omitted) ("The prosecution team is defined as the prosecutor or anyone over

whom he has authority, and includes both investigative and prosecutorial personnel."); *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (same); *United States v. Perdomo,* 929 F.2d 967, 970 (3d Cir. 1991) (same); *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) (same); *United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (same). "The government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the 'prosecution team.'" *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002).

"An 'arm of the prosecution' is any government agent or agency that investigates and provides information specifically aimed at prosecuting a particular accused." *Perez v. United States*, 502 F. Supp. 2d 301, 309 (N.D.N.Y. 2006); *see also United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (citing *Morell*, 524 F.2d at 555) (internal citation omitted) ("[T]he propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.' It does not turn on the *status* of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person *did,* not who the person *is.*"); *United States v. Trevino,* 556 F.2d 1265, 1272 (5th Cir. 1977) (stating in dictum that the term "arm of the prosecution" includes the prosecutor and closely connected investigative agencies); *Morell*, 524 F.2d at 555 (holding that when "a DEA agent who had kept a confidential file on an informant, the Government's key witness . . . [and] participated actively in the investigation . . . [the court] deemed it fair to treat him as an 'arm of the prosecutor'"). The United States Attorney's Manual provides that: "Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." U.S. Dep't of

Justice, U.S. Attorney's Manual 9-5.001(B)(2) (Oct. 1, 2006) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

Exactly who constitutes a member of the prosecution team is determined using a "case-by-case analysis of the extent of interaction and cooperation between" a potential member of the team and the prosecutor. *Avila*, 560 F.3d at 308. Whether someone is part of the prosecution team depends on the degree of interaction between the prosecutor and the agency or individual. *See Locascio.* 6 F.3d at 949 (holding that the reports made by FBI agents in the course of investigations apparently unrelated to the defendants' prosecutions should not be imputed to the prosecution); *Pina v. Henderson,* 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case).

The prosecution team in any given case may have many members with diverse duties. At its core, members of the team perform investigative duties and make strategic decisions about the prosecution of the case. *See, e.g.*, *Kyles,* 514 U.S. at 438 (police investigator); *Giglio,* 405 U.S. at 154 (fellow prosecutor). The prosecution team may also include individuals who are not strategic decision-makers, including members of the Marshal Service who perform tasks at the prosecution's request. *See, e.g., Bin Laden,* 397 F. Supp. 2d at 481 (finding that agents of the United States Marshals Service's Witness Security Program were members of the prosecution team because, at the prosecutors' request, the agents installed and continuously operated video-teleconference equipment "in order to further the Government's investigation."). Members of the prosecution team may include testifying police officers and federal agents who submit to the directions of the prosecutor and aid the Government in its investigation. *See Pina*, 752 F.2d at

47; *Bin Laden,* 397 F. Supp. 2d at 481. Under the totality of the circumstances, the more involved an individual is with the prosecutor, the more likely he is a team member. *United States v. Stewart,* 323 F. Supp. 2d 606, 616-18 (S.D.N.Y. 2004), *aff'd*, 433 F.3d 273 (2d Cir. 2006). Among many others, these circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy. *See United States v. Diaz,* 176 F.3d 52, 106–07 (2d Cir. 1999). Witness interference or intimidation committed on behalf of the government, such as by law enforcement agents or government administrators, may be imputed to the prosecution and the government actors held to be members of the prosecution team. *United States v. Lorefice*, 192 F.3d 647, 651-52 (7th Cir. 1999) (citing *United States ex rel. Smith v. Fairman*, 769 F.2d 386, 391 (7th Cir. 1985)). "[F]rom a legal standpoint, misconduct by the investigating law enforcement agents is indistinguishable from misconduct by the prosecuting attorneys." *Lorefice*, 192 F.3d at 651-52.

"The government cannot compartmentalize the Department of Justice and permit it to bring a charge affecting a government employee in the [Marshals Service] and use him as its principal witness, but deny having" possession of Marshals Service records, files, and other evidence. *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds by United States v. Henry*, 749 F.2d 203, 206 n.2 (5th Cir. 1984); *see, e.g.*, *United States v. Sanchez,* 813 F. Supp. 241, 247 (S.D.N.Y. 1993), *aff'd on other grounds,* 35 F.3d 673 (2d Cir. 1994) (imputing to the prosecutor knowledge of the perjury of local police officers who had been deputized as federal agents and worked as part of a joint task force investigating a narcotics conspiracy of which the defendant was charged as a member). Furthermore, knowledge of evidence or anything held by any federal agency is imputed to the prosecutors if it lies within an agency that is "part of the team that investigated [the] case or participated in its prosecution."

*Morris*, 80 F.3d at 1169-70; *see also United States v. Zuno–Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) (The "prosecutor is deemed to have knowledge of and access to anything in the custody or control of any federal agency participating in the same investigation of the defendant."); *United States v. Heller*, 830 F.2d 150, 153 n.3 (11th Cir. 1987) (holding that the conduct of a government actor who threatens a witness with potential prosecution based on his relationship with the defendant in an attempt to "scare" or "control" the witness will be imputed to the prosecution for determining whether the defendant's Fifth Amendment right to due process of law has been violated).

In *United States v. Vole*, 435 F.2d 774, 778 (7th Cir. 1970), the Seventh Circuit had the occasion to consider a situation in which the criminal defendants claimed that the United States Marshal was preventing them from accessing certain witnesses. "At the beginning of the trial, Vole moved on behalf of all defendants for an order to the United States Marshal permitting them access to co-defendants and witnesses in the custody of the government . . . contend[ing that] his defense counsel was prevented by the Marshal from interviewing such witnesses." *Id*. The Seventh Circuit remanded the case to the district court on different grounds, but it noted that it "wish[ed] to make it clear that witnesses are the special property of neither party[.]" *Id*. (citing *Gregory*, 369 F.2d at 188; *Callahan v. United States*, 371 F.2d 658, 660 (9th Cir. 1970)). The court held that on remand, "the district court should facilitate access to [these witnesses] before trial whenever it is requested" by the defense. *Vole*, 435 F.2d at 778. The *Vole* court cited two cases to support its holding with respect to the issue of the United States Marshal preventing access to witnesses, both of which deal with the constitutional violations that can arise under the Fifth Amendment's Due Process Clause or the Sixth Amendment's Compulsory Process Clause when the defendant is prevented by the government from accessing witnesses. *Id*. The first case

is the D.C. Circuit's seminal opinion in *Gregory*, 369 F.2d at 188, in which the court stated that "the defendant was denied that opportunity which, not only the statute, but elemental fairness and *due process required that he have*." (emphasis supplied). The second case cited by the *Vole* court is *Callahan*, 371 F.2d at 660, in which the court held that "appellant's counsel requested that the indictment be dismissed on the grounds that the defendant's rights under the 5th and 6th Amendments of the United States Constitution had been violated by actions of the United States Attorney and the witnesses subpoenaed by the Government, counsel for the appellant asserted, 'these persons were advised that they need not talk to anyone about this case, and that such advice was in such form that it was understood by at least one of these persons to mean that he could not talk to me' . . . . No evidence was presented in support of the assertions. . . .[therefore] [a]ppellant's specification that the District Court erred in failing to dismiss the indictment is without merit." *Callahan* is strikingly similar to the facts of the present case, as there the defendant claimed that the United States Attorney and the United States Marshal advised witnesses not to communicate with defense counsel. *Id.*

In *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001), another case concerning the United States Marshals Service, the Seventh Circuit held that when members of the Marshal Service discover any information that might plausibly be helpful to the defense, the Marshal Service becomes a part of the prosecution team and is acting as an arm of the government. ("We agree with the defendants that such imputation is proper in these circumstances; it is impossible to say in good conscience that the U.S. Marshal's Service was not 'part of the team' that was participating in the prosecution, even if the role of the Marshal's Service was to keep the defendants in custody rather than to go out on the streets and collect evidence."). The Seventh Circuit's decisions in *Vole*, 435 F.2d at 778, and *Wilson*, 237 F.3d at 832, may be read together

for the proposition that in the Seventh Circuit the Marshal Service becomes part of the prosecution team when it is in possession of evidence favorable to the defendant or when it obstructs the defendant's access to witnesses, and that therefore the Marshals Service may be liable for violating a criminal defendant's Fifth Amendment right to due process of law or Sixth Amendment right to compulsory process of witnesses in his favor.

Marshal McPherson first began investigating the Linder excessive force incident after reporting it to potential members of the prosecution team who advised him that he should move forward with an interview of Linder. McPherson directed deputies to conduct the victim interviews, take photographs of the victim, and write reports regarding the investigation. The Marshal also provided the OIG investigator with his employees whenever the Investigator requested them for interview. He complied with the Investigator's request for seizure of the Blackberry smart phone and computer from Linder and he complied with each request for information or help throughout the investigation. It was clear from the Marshal's testimony at the hearing that his motivation was in good faith and he acted as a professional seeking to fulfill his obligations as the senior law enforcement officer facing a unique set of circumstances. Marshal McPherson sought regular legal advice from Office of General Counsel to verify his actions and to seek guidance on how to address each of the concerns facing him in an effort to maintain efficient operations at the Marshal Service.

Although his motivation was clear, in analyzing whether he was a member of the prosecution team, the Court must not look to his motives but rather to his actions. While attempting to be cooperative and helpful, and by following the directions of the OGC, and the directions of the OIG Investigator, the Marshal's actions were relied upon significantly by the investigative team to build its case and to prosecute the defendant. In fact, the significant

portion of evidence presented at the hearing was evidence that was obtained in part due to the Marshal's support, whether that was in the form of facilitating interviews, gathering evidence or directing others to provide investigative steps to the Investigator. The Marshal, in his efforts to do the right thing under difficult circumstances became a part of the prosecution team due to his significant involvement in the gathering of evidence to be used by the team. Investigator Shirley essentially used the Marshal as an arm of the prosecution to aid him in his work.

Specifically, Marshal McPherson, or another Marshal Service employee under his control, twice sent DUSM Banos and Inspector Walenda out to interview and photograph Solis, the alleged victim of the charges contained in Count I of the Indictment against Linder. On July 13, 2010, after conducting their first interview with Solis and taking a photograph of him, Banos and Walenda returned to the District office and reported back to McPherson and Chief O'Malley. O'Malley testified that when he discovered that Walenda and Banos had interviewed Solis and taken a single photograph, he sent them back out to Solis's residence because the first interview was conducted poorly and the photograph was insufficient.

Although McPherson does not recall sending Banos or Walenda to take photographs of Solis, the alleged victim, Walenda testified that McPherson had, in fact, instructed him to go back out a second time and take more photographs. During the second interview, on July 14, 2010, Banos took 11 additional photographs of Solis. After they conducted the second interview of Solis, Walenda and Banos again reported back to McPherson. The Report of Interview prepared by Walenda and the photographs taken by Banos were eventually given to Agent Shirley of the OIG, as well as the Assistant United States Attorneys who are prosecuting this case.

On August 25, 2010, at Shirley's direction, Banos sent an e-mail to Shirley that contained a private text message conversation between himself and Linder. Again, on August 30, 2010, at Shirley's direction, Banos sent three e-mails to Shirley containing the eleven photographs he had taken of Solis during the course of the second interview; photographs which were taken at the direction of Marshall Service management.

McPherson also personally and actively interviewed Linder on at least two occasions and those interviews became part of Shirley's case. On July 12, 2010, the day that the Marshall Service management learned of the allegation, McPherson summoned Linder into his office for the purpose of questioning him after he was informed that it was appropriate to do so. Also present were O'Malley, Supervisory Inspector Farrell, and Supervisory Deputy United States Marshal Block. Although Ferrell testified that he expressed concern that Linder should be informed of his rights, all of those who testified stated that he was not. His statements to the Marshal Service management in the room that day were provided to Shirley for his investigation. The United States Marshals Service Policy Directives state that in a misconduct investigation, the Marshal Service employee under investigation has certain rights, including the right to notice and the right to certain warnings. The interview, however, was conducted after the Marshal verified that it was appropriate to conduct the interview and it was provided to Shirley in spite of the lack of any warnings issued to Linder.

Three days later, on July 15, 2010, McPherson confronted Linder a second time. This meeting occurred at the headquarters of the GLRFTF, where Linder worked. The meeting occurred in the presence of Marshall Service management, as well as Linder's supervisors. McPherson, O'Malley, Farrell, Block, Grunwald, and Decker were all present at the meeting. The purpose of this meeting was to discuss Linder's placement, and afterwards McPherson

reassigned Linder from the GLRFTF back to the District office. The statements attributable to Linder were shared with the OIG agents investigating this case, as well as the Assistant United States Attorneys who are prosecuting it. McPherson also agreed to participate in the ruse to bring Linder to the OIG agents Shirley and Semmerling in an effort to interview him and obtain a confession. The Marshall followed Shirley's directions to lead Linder to a room where Shirley and Semmerling were surreptitiously waiting for him. Shirley devised this scheme and gave McPherson special instructions as to how Shirley wanted it carried out. McPherson followed all of Shirley's instructions. The Government even concedes that "McPherson complied with SSA Shirley's request." (Doc. 87, Gov.'s Post-Hr'g Br. at 8.) This ruse was an effort by Shirley to get Linder in an interview situation where he would be off guard and would possibly confess to the allegations against him. The Marshal's role unfortunately had a manipulative effect in that Linder would naturally follow the Marshal's directions to appear at the time and place of a requested meeting, which he did, only to learn that he was being interviewed by Shirley and investigators and not having a volunatary meeting with his boss. (R. 48, Def.'s Pre-Hr'g Br. at 8.) The Marshal in this way played an active role in the investigation.

In less direct ways, the Marshal also facilitated the investigation by helping to coordinate interviews. Shirley, as "a courtesy" gave McPherson notice when he wanted to interview a certain individual under McPherson's command before he would meet with him. Yet, Shirley's notices were less notifications of courtesy than they were requirements that the Marshall cooperate in his investigation by directing exactly how Shirley wanted to approach any specific individual. For example, Shirley sent McPherson an e-mail, stating: "If you decide that you would like to notify the individuals in question of the pending interview, I would ask they be notified separately and not informed of any other individual who may be interviewed." Shirley

gave McPherson special instructions about his interview with Linder—instructions that called for deception, duplicity, and active participation in the investigation. For all other Marshal Service personnel that Shirley wanted to interview, he would simply provide a time to McPherson so that McPherson could ensure that he had enough resources available to cover the times that Shirley wanted to speak with a witness employed by the Marshal Service. Shirley contacted McPherson for this purpose on an unknown number of occasions. Shirley granted McPherson the discretion to tell all of his subordinates, except Linder, that the purpose of these meetings was to be interviewed by OIG agents. Shirley testified that he had a "large number" of telephone calls and "several" meetings on "multiple occasions" with the Marshall Service in the District. Yet, where Shirley may have been cooperative with the Marshal about accommodating witnesses under McPherson's control, he behavior was drastically different when approaching members of the GLRFTF – the coworkers of Linder.

Shirley testified that he informed the Marshal that there was tension and division within the Marshal Service in the District. Indeed, Shirley brought this matter to McPherson's attention "a few times." Shirley complained to McPherson that he was "not having any success" securing voluntary interviews from Marshal Service personnel under McPherson's command. When Shirley's attempts to interview Government witnesses did not get any easier, he summoned the prosecutors and they asked McPherson for a meeting. McPherson agreed to meet with Shirley and the Assistant United States Attorneys, Cha and Blumberg, in his office around May of 2011, which was right in the middle of the OIG's investigation of Linder. Thereafter, AUSA Cha and Blumberg, along with Shirley, met with McPherson and discussed the way in which they believed potential Government witnesses were allegedly being intimidated and how best to improve the situation.

In an effort to separate themselves from the Marshal, the Government argues that McPherson knew nothing about matters involving witnesses. (Doc. 87, Gov.'s Post-Hr'g Br. at 5-10.) This requested meeting belies that position. The prosecutors and the investigative agents personally petitioned McPherson to intervene regarding the apparent difficulties they were having with McPherson's subordinates who were witnesses to the alleged crime. The only reason to meet with the Marshal was to rally his support in their efforts to get certain potential witnesses to cooperate with them.

In addition, when the OIG wanted to search Linder's Blackberry for evidence. Shirley instructed McPherson to seize the Blackberry from Linder and deliver it to him. McPherson delegated this task to O'Malley and Supervisor Robinson. McPherson testified that he knew Linder's Blackberry contained evidence that could be used against Linder in a criminal case. The Marshals Service thus acted on behalf of, and in concert with, the OIG by obtaining the Blackberry and giving it to OIG agents.

Also, following the directions of the government, the Marshal interviewed Linder. It is undisputed that during that interview, Linder was not provided with any statement of his rights. Both McPherson and O'Malley confirmed to the Court at the evidentiary hearing on this motion that no one at any time during the course of the 18-month investigation of Linder administered either the *Garrity* or the *Kalkines* warnings to him. (*Id*. at 209, 317) (citing *Garrity v. New Jersey,* 385 U.S. 493, 500 (1967) (holding that where police officers being investigated were given the choice to either incriminate themselves or to forfeit their jobs under a New Jersey statute dealing with forfeiture of office or employment tenure, as well as pension rights of persons refusing to testify on the grounds of self-incrimination, and the officers chose to make confessions, the confessions were not voluntary, but were coerced, and the Fourteenth

Amendment prohibited the use of the officers's confessions in any subsequent criminal prosecutions of the officers in State court); *Kalkine v. United States*, 473 F.2d 1391, 1392-93 (Ct. Cl. 1973) (holding that a Customs Bureau employee could not be discharged from his post for his failure to answer questions by the Bureau concerning his finances and payments from importers, where, although there was a pending criminal investigation of the Customs Bureau employee, he was not advised that his answers or their fruits could not be used in any criminal prosecution that might be brought against him)). "In recent years the courts have given more precise content to the obligations of a public employee to answer his employer's work-related questions where, as here, there is a substantial risk that the employee may be subject to prosecution for actions connected with the subject of management's inquiry. It is now settled that the individual cannot be discharged simply because he invokes his Fifth Amendment privilege against self-incrimination in refusing to respond." *Kalkine*, 473 F.2d at 1392-93 (citing *Gardner v. Broderick*, 392 U.S. 273, 278 (1968); *Uniformed Sanitation Men Assen v. Comm'r of Sanitation*, 392 U.S. 280, 284-85 (1968) (*Uniformed Sanitation I*)).

The *Gareth* warning, derived from the United States Supreme Court's decision in *Gareth*, 385 U.S. at 500, is an advisement of rights, usually administered by State or local government investigators, to an employee of the State or a local government who is the subject of an internal investigation or disciplinary proceeding. *Id*. at 499. The warning finds it basis in the Fifth Amendment to the United States Constitution, which declares that the government cannot compel a person to be a witness against himself, a protection that was incorporated against the States via the Fourteenth Amendment in *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."). *Gareth*, 835 U.S. at 497; *see*

*also* U.S. Const., amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself.").

The Court identified the question posed by *Gareth* as "whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee." *Gareth*, 835 U.S. at 499. The *Gareth* Court answered the question in the negative, holding that it presented a constitutional infirmity and explicitly stating its holding that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other member of our body politic." *Id*. at 500. The *Gareth* warning advises employees who are under investigation or subject to disciplinary measures of their criminal and administrative liabilities for any statement that they may choose to make, and also advises the employees of their right to remain silent on any issue that has the potential of implicating or exposing them to criminal liability. *Id*. at 499-500. By invoking *Gareth*, an employee raises his right against compulsory self-incrimination, and any statement given under threat of discipline or discharge made after the employee's invocation of *Gareth* may only be used for internal investigation or disciplinary proceeding purposes and not for the purpose of criminal prosecution. *Id*. at 500. The Supreme Court stated in *Gareth*, 385 U.S. at 497, that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."

The *Kalkine* warning, derived from the United States Court of Claims's decision in *Kalkine*, 473 F.2d at 1392-93, is a similar advisement of rights to those provided by *Gareth*, however, instead of implicating State or local government employees, it is usually administered

74

by United States federal agents to federal government employees and contractors in internal investigations and disciplinary proceedings, frequently when it is suspected that a crime has been committed. The *Kalkine* warning compels United States employees to make statements or else face disciplinary action, up to and including dismissal. *Id*. (citing *Gardner*, 392 U.S. at 278; *Uniformed Sanitation I*, 392 U.S. at 284-85; *Uniformed Sanitation Men Assen v. Comm'r of Sanitation*, 426 F.2d 619, 626 (2d Cir. 1970) (Friendly, J.) (*Uniformed Sanitation II*)). However, the *Kalkine* warning provides federal employees who are suspected of criminal conduct with immunity for their statements. *Kalkine*, 473 F.2d at 1393 (citing *Gareth*, 385 U.S. at 500). In the absence of a federal employer's administration to an employee of the *Gareth* warning, a federal employer may not discipline, discharge, or remove an employee from his federal employment based on a charge that the employee failed to cooperate in the federal employer's investigation or proceeding when such investigations or proceedings may possibly expose the employee to criminal liability. *Id*.

Under *Kalkine*, a federal employee can be subjected to "[p]roper proceedings in which the employee is asked only pertinent questions about the performance of his duties *and is duly advised of his options and the consequences of his choice*. . . . To require a public body to continue to keep an officer or employee who refuses to answer pertinent questions concerning his official conduct, *although assured of protection against use of his answers or their fruits in any criminal prosecution*, would push the constitutional protection beyond its language, its history or any conceivable purpose of the framers of the Bill of Rights." *Id*. (quoting *Uniformed Sanitation II*, 426 F.2d 626-27) (Friendly, J.) (internal quotation marks omitted)). Thus, if a federal employee is granted immunity from prosecution for their testimony, yet nevertheless chooses not to answer the government's questions, the government possesses the authority to

discipline the employee for his refusal to answer the questions asked. *Kalkine*, 473 F.2d at 1393. The United States Court of Claims (now the United States Court of Federal Claims (trial level jurisdiction) and the United States Court of Appeals for the Federal Circuit (appellate jurisdiction)) (*see* Federal Courts Administration Act of 1992, Court of Federal Claims Technical and Procedural Improvements Act of 1992, PL 102-572, Oct. 29, 1992, 106 Stat 4506), stated in *Kalkine*, 473 F.2d at 1393, that "a governmental employer is not wholly barred from insisting that relevant information be given; the public servant can be removed for not replying if he is adequately informed both that he is subject to discharge for not answering and that his replies (and their fruits) cannot be employed against him in a criminal case."

Under *Gareth* and *Kalkine*, government employees can be compelled, by threat of adverse employment action up to and including termination, to answer questions posed by their government employers in the course of investigations or proceedings, and in turn the employees are immunized from future criminal prosecution for any incriminating statements they may make in the course of answering their government employer's questions. *See Gareth*, 385 U.S. at 500; *Kalkine*, 473 F.2d at 1393; *see also Chavez v. Martinez*, 538 U.S. 760, 768 (2003) ("We have also recognized that governments may penalize public employees and government contractors (with the loss of their jobs or government contracts) to induce them to respond to inquires, so long as the answers elicited (and their fruits) are immunized from use in any criminal case against the speaker."); *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity" against later use of their statements in criminal proceedings.); *Lefkowitz v. Turley*, 414 U.S. 70, 78-79 (1973) (citing *Kastigar v. United States*, 406 U.S. 441 (1972)) (The Fifth

Amendment permits a witness to refuse to answer any question asked of him "unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. . . .[E]mployees of the State do not forfeit their constitutional privilege and [ ] they may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions."); *Gardner*, 392 U.S. at 278 (internal citation omitted) ("If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self-incrimination would not have been a bar to his dismissal."); *Uniformed Sanitation I*, 392 U.S. at 285 ("[P]etitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights."); *United States v. Moten*, 551 F.3d 763, 766 (8th Cir. 2008) ("The Fifth Amendment privilege against self-incrimination extends to statements a government employee is compelled to make under the threat of removal from public office."); *United States v. Vangates*, 287 F.3d 1315, 1320-21 (11th Cir. 2002) (internal citations and quotation marks omitted) ("Thus, a public employee may not be coerced into surrendering his Fifth Amendment privilege by threat of being fired or subjected to other sanctions, and cannot be forced to choose between self-incrimination or job forfeiture. Indeed, the protection against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office .... The state, of course, can compel a public employee to answer questions in a formal or informal proceeding by granting that employee immunity from future criminal prosecution based on the

answers given."); *Riggins v. Walter*, 279 F.3d 422, 431 (7th Cir. 1995) ("In contrast, this circuit requires that before taking disciplinary action, a public employer must inform the employee that any compelled statements could not be used in criminal proceedings."); *Hester v. City of Milledgeville*, 777 F.2d 1492, 1495 (11th Cir. 1985) ("[A] governmental unit which requires an employee to make potentially incriminating statements may not burden the employee's [Fifth Amendment] right to exercise the privilege in a later criminal proceeding by threatening to discipline or discharge the employee if he or she refuses to waive it."); *Gulden v. McCorkle*, 680 F.2d 1070, 1075 (5th Cir. 1982) (citing *Gareth*, 385 U.S. at 500) ("An employee who is compelled to answer questions (but who is not compelled to waive immunity is protected by *Gareth* from subsequent use of those answers in a criminal prosecution. It is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity."); *United States v. Devitt*, 499 F.2d 135, 141 (7th Cir. 1974) (citing *Gareth*, 385 U.S. at 500) ("Nor may disciplinary action be taken against the witness for his refusal to testify, unless he is first advised that, consistent with the holding in *Gareth*, evidence obtained as a result of his testimony will not be used against him in subsequent criminal proceedings.").

The purpose of the *Gareth* and *Kalkine* warnings are to ensure that government employees's constitutional rights, particularly their Fifth Amendment right against compelled self-incrimination, are preserved and protected, while simultaneously helping State, local, and federal employers effectively pursue and conduct internal or administrative investigations and carry out the functions of government. These two warnings are designed to strike a balance between the Fifth Amendment privilege against self-incrimination by government employees and the government's interest in obtaining information necessary to the advancement of

governmental functions. *Turley*, 414 U.S. at 81. The *Gareth* and *Kalkine* warnings "ultimately rest on a reconciliation of the well-recognized policies behind the privilege of self-incrimination and the need of the State, as well as the Federal Government, to obtain information to assure the effective functioning of government." *Id*. Contained within the rationales of *Gareth* and *Kalkine* is the proposition that government employees should not be put to the Hobson's choice of deciding between self-incrimination and the forfeiture of their employment.

The Marshal, who sought advice during the first weeks of his position from both the OGC and the government was not provided with any guidance on how to approach Linder with an eye to preserving his rights in light of *Gareth* and *Kalkine*. As such, by following the directions of the government, the warnings were not provided to Linder.

All of these actions that aided the OIG investigation, took on a more significant light when the Marshal followed the directions of the OGC and sent out e-mails to his staff regarding how they must interact with the investigators and with defense counsel. As is discussed more fully below, e-mails were sent from the Marshal's office regarding "specific rules that must be adhered to" by Marshal Service personnel in their interactions with Linder, the defense team, and the Government. In the first e-mail, which was sent to all Marshal Service personnel and employees in the District, McPherson instructed that "[a]ny contact with prosecutors and investigators involved in the case must be handled in a polite, professional, and appropriate manner." By contrast, the e-mail instructed the same personnel to not discuss the case with Linder or anyone else except as authorized or as a matter of official duty. The e-mail further instructed that Marshal Service employees must limit their personal contact with Linder. In addition, McPherson ordered that all Marshal Service employees were not to discuss the case with Linder's attorneys or associates except after notifying management and receiving

authorization. Assistant Chief McFarden sent a second e-mail to all Marshal Service personnel in the District. The second e-mail attached potential disciplinary sanctions and criminal offenses for violation of the Marshal's "specific rules." McFarden attached to the second e-mail a Table of Marshal Service and Department of Justice Offenses. Several witnesses testified at the evidentiary hearing that the e-mails intimidated them not to speak with the defense. This sort of witness intimidation committed on behalf of the Government may be imputed to the prosecution and the government actors held to be members of the prosecution team.

## II.  Whether Linder's Constitutional Rights Were Violated and Whether He Consequently Suffered Prejudice

Threats or intimidation made by the government that dissuade a potential defense witness from testifying constitute a violation of the defendant's Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process for obtaining witnesses in his favor. *Webb*, 409 U.S. at 98. The right to offer testimony of a witness and compel their attendance is commensurate with the right to present evidence and a defense to a jury. *Id*. "Just as the accused has the right to confront the prosecution's witness for the purposes of challenging their testimony, he has the right to present his own witnesses to establish a defense." *Id.*; *see also United States v. White*, 454 F.2d 435, 438-39 (7th Cir. 1971) (citing *Gregory*, 369 F.2d at 188) ("While it is true that witnesses to a crime are the property of neither the prosecution nor the defense and that both sides have an equal right and should have an equal opportunity to interview them," an indictment may be dismissed upon "a clear showing that the government instructed the witness not to cooperate with the defendant.").

"The importance to a litigant of interviewing potential witnesses is undeniable. In particular, in criminal cases, where a defendant's very liberty is at stake, such interviews are especially crucial. Thus it is that one of the first things responsible counsel does in preparing a

case is to seek to interview those witnesses involved in the litigation." *United States v. Fischel*, 686 F.2d 1082, 1092 (5th Cir. 1982). The constitutional right of a criminal defendant to call witnesses in his defense requires that they are free to testify without fear of reprisal or retaliation from the government. *Skilling,* 554 F.3d at 567; *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982). "A defendant has the right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense." *United States v. Tsutagawa*, 500 F.2d 420, 423 (9th Cir. 1974). As the Supreme Court has observed, "the desirability of calling John Doe as a witness, or at least interviewing him in preparation for trial [is] a matter for the accused rather than the government to decide." *Rovario v. United States*, 353 U.S. 53, 64 (1957).

Government interferences generally occur when agents of the government instruct a witness not to speak with the defense or otherwise artificially restrict the defense's access to a witness. *See United States v. Agostino*, 132 F.3d 1183, 1192 (7th Cir. 1997) (citing *White,* 454 F.2d at 439; *United States v. DeRobertis,* 766 F.2d 270, 274 (7th Cir. 1985)). "It is well-settled that substantial government interference with a defense witness's free and unhampered choice to testify violates the defendant's due process rights." *Newell v. Hanks*, 283 F.3d 827, 837 (7th Cir. 2002) (citing *United States v. Vavages,* 151 F.3d 1185, 1191 (9th Cir. 1998) (the prosecutor substantially interfered with a witness's decision whether to testify where he threatened to withdraw the witness's plea agreement in her own unrelated criminal prosecution if she testified in support of the defendant's alibi); *Freeman v. Georgia,* 599 F.2d 65, 69 (5th Cir. 1979) (a police detective who concealed the whereabouts of a witness committed a due process violation); *Lockett v. Blackburn,* 571 F.2d 309, 314 (5th Cir. 1978) (where the prosecutor sent

the witnesses out of State before trial he violated the defendant's right to due process); *Morrison,* 535 F.2d at 225-28 (where the prosecutor repeatedly warned and intimidated a prospective defense witness about the possibility of perjury charges if she testified falsely, the defendant's right to due process was violated)); *Burke*, 425 F.3d at 411; *Skilling*, 554 F.3d at 567 (quoting *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997)); *United States v. Roach*, 502 F.3d 425, 437 (6th Cir. 2007) (citing *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995)).

To challenge the government's conduct on Sixth Amendment or due process grounds for witness interference, the defendant is required to make a "clear showing" that the government instructed the witness not to cooperate with the defense. *Roach*, 502 F.3d at 437. With respect to interviewing witnesses "our constitutional notions of fair play and due process dictate that defense counsel be free from obstruction, whether it comes from the prosecutor in the case or from a state official or another state action under color of law." *Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 44 (2nd Cir. 1975). Government interference with potential defense witnesses requires dismissal of an indictment where a substantial right of the defendant has been jeopardized, such as the right to due process of law secured by the Fifth Amendment or the right to compulsory process of defense witnesses secured by the Sixth Amendment. *United States v. Wilson*, 715 F.2d 1164, 1169 (7th Cir. 1983).

A defendant's Sixth Amendment right to compulsory process is violated when the defendant is deprived of testimony that would have been relevant, material and vital to his defense—in other words, when he is prejudiced. *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982) (quoting *Washington*, 388 U.S. at 16). Such a deprivation constitutes a violation of the defendant's right to due process of law. *Valenzuela–Bernal*, 458 U.S. at 867. To succeed

on a motion to dismiss an indictment for violating the defendant's Sixth Amendment right to compulsory process of witnesses or his Fifth Amendment right to due process of law, the defendant must make some plausible showing of how the witness's testimony would have been both material and favorable to aiding him in his defense. *Id*. at 859. Such interference may involve threats of prosecution or other intimidating conduct. *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988).

An agent working on behalf of the government violates a defendant's rights where the agent threatens to retaliate against a witness or makes intimidating statements to a witness that interfere with or prevent the witness from testifying. *United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979), *aff'd on reh'g*, 605 F.2d 862 (5th Cir. 1979). The prosecution and the defense have an equal right to interview witnesses in criminal proceedings, although the defendant's Sixth Amendment right of access is not violated when a witness chooses on his or her own accord not to be interviewed by the defense. *United States v. Bittner*, 728 F.2d 1038, 1041-42 (8th Cir. 1984); *see also United States v. Bowens*, 318 F.2d 828, 829 (7th Cir. 1963) (holding that the witness is free to decide whether to grant or refuse an interview and that it is not improper for the government to inform the witness of that right).

Witnesses "are the special property of neither party," *Vole*, 435 F.2d at 778, and "both sides have an equal right and should have an equal opportunity to interview them," *White*, 454 F.2d at 438-39. *See also United States v. Soape,* 169 F.3d 257, 270 (5th Cir. 1999) (quoting *Gregory*, 369 F.2d at 188) (internal quotation marks omitted) ("[A]s a general rule, [w]itnesses ... to a crime are the property of neither the prosecution nor the defense. Both sides have an equal right, and should have an equal opportunity, to interview them."). However, the prosecution may not interfere with a witness's free choice to speak with a defense attorney; such

interference can amount to a denial of due process in violation of the Fifth Amendment or the defendant's Sixth Amendment right to compulsory process of witnesses in his favor. *Newell,* 283 F.3d at 837; *Skilling,* 554 F.3d at 567; *Roach*, 502 F.3d at 437. This is not to say that the government can not advise a potential witness of his right to decline interviews with defense counsel; in such an instance, there is no interference and as such there is no violation of the defendant's Sixth Amendment right of access to the witness no denial of due process. *Bittner*, 728 F.2d at 1041; (citing *United States v. Scott,* 518 F.2d 261, 267-68 (6th Cir. 1975); *United States v. Long,* 449 F.2d 288, 295 (8th Cir. 1971)). Inherent in that advice is the ability for the witness to choose to accept it or deny it and therefore decide for himself whether he wants to speak with defense counsel.

However, when the government's actions substantially impair a witness's decision to testify, such as by threat, coercion, interference, or intimidation, and the witness's free decision to testify is hampered, the government has denied the defendant of his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process of witnesses in his favor, and the proper remedy for such misconduct may be the dismissal of the indictment. *Burke*, 425 F.3d at 411 (holding that a federal court possesses the power to dismiss an indictment when the government violates the defendant's right to due process); *United States v. Antonino*, 830 F.2d 798, 804 (7th Cir. 1987) (quoting *United States v. Gouveia,* 467 U.S. 180, 192 (1984)) (internal quotation marks omitted) ("The Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense."); *Calzada*, 579 F.2d at 1363 (emphasis supplied) ("On the record before us, we cannot say that the district court erred

in finding that the defendants' constitutional rights to compulsory process had been violated, nor that it abused its discretion in *concluding that the only reasonable remedy for that violation was the dismissal of the indictment*."). "[P]rejudice to the defendant is an essential element when a criminal defendant seeks dismissal of an indictment due to prosecutorial misconduct." *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987).

Against this backdrop of the law, the actions of the prosecution must be placed. Within one day after the Indictment against Linder was returned by the Grand Jury, the Marshal sent an e-mail to all Marshal Service personnel in the District. The e-mail commanded all Marshal Service personnel to follow "specific rules that must be adhered to" with respect to Linder. In the e-mail the Marshal instructed that "[a]ny contact with prosecutors and investigators involved in the case must be handled in a polite, professional, and appropriate manner." In sharp contrast, the e-mail instructed the same personnel to not discuss "*any matter about the case with DUSM Linder* or anyone else except as authorized or as a matter of official duty." The e-mail further instructed that "Marshal Service employees *must limit their personal contact and socialization with DUSM Linder* to not create any appearance of the above." Finally, the most significant order for purposes of the Court's constitutional analysis was the final instruction in the e-mail of "specific rules" setting forth that "[USMS] employees *may not discuss the case with DUSM Linder's attorneys* or associates except after notifying management and receiving authorization."

After circulating this first e-mail throughout the Marshal Service, certain problems immediately arose with various deputies questioning the order especially those deputies who had served in the Marshal Service during the previous management when a different deputy Marshal was under investigation. Because the orders were drastically different, some of the deputies testified that they were immediately concerned that they would be punished if they had contact

with Linder. Of course, their concerns were only magnified when the second e-mail was issued. Assistant Chief McFarden sent a second e-mail to all Marshal Service personnel in the District. The second e-mail contained the Marshal's original e-mail of "specific rules," but this e-mail also included a threat to all personnel if they failed to follow the Marshal's rules. The second e-mail attached potential disciplinary sanctions and criminal offenses for violating the "specific rules." In addition, McFarden wrote in the second e-mail that "[i]f I become aware of behavior that is contrary to the above listed guidance, it will be dealt with and through the U.S. Marshal Service's official discipline process and Employee Relations. For your reference, I have attached a Table of Marshal Service and DOJ Offenses. The list is *not* all exhaustive. Please take time to review it." The attachment had the *in terrorem* effect of making a violation of the Marshal's rules a prosecutable offense.

Once the second e-mail was sent, many of the deputies who testified at the hearing stated that they no longer questioned the directives, it became clear to them that any involvement with Linder or his defense attorney would result in being disciplined at best and fired from their position at worst. At a bare minimum, the deputies knew that their conduct would become the part of a disciplinary proceeding. The combination of the two e-mails, with the aggressive interviewing tactics of Shirley, and the threats of prosecution by the prosecutors, the deputies no longer had a choice to talk with Linder or his counsel. That choice had been taken away by the prosecution team because any choice that was not condoned by the government was a choice that would result in sanctions, either civil or criminal. The e-mails substantially hampered Linder in his ability to conduct a defense investigation. Not only were the deputies warned that any discussion with the defense could result in discipline, the order stretched so far as to impair their right to associate with Linder socially. They were threatened with discipline if they interacted in

any manner socially and personally with Linder if Management deemed that the personal interaction improper.

The first deputies who testified at the hearing discussed the impact of the e-mails. Each testified that he wanted to interact with Linder, wanted to speak with the defense but feared that any interaction with the defendant or the defense would result in discipline. Most of the deputies offered that they would provide the defense with their statement that in all of their dealings with Linder he had never acted unprofessionally or had used excessive force. One might argue that the deputies were only providing character evidence and as such the defense here was not harmed. The problem with this analysis is that the witnesses were deprived of that choice to be interviewed, Linder was deprived of the ability to have his counsel explore whether they might be able to add more than merely character evidence, and Linder was blocked from being able to explore and develop a defense based on the information that they might have been able to provide to the defense. Afterall, a seasoned defense attorney may explore various tactics of defense and he knows better than the witness whether the answers to his questions are valuable to that defense. Often the witness's belief of whether his statement is helpful or not is not evident to the witness but may be critical to the seasoned trial attorney. In short, even those alleged character witnesses who testified that they were intimidated into not speaking with the defense might be critical to the defense. The point is that the defense was never given the opportunity to even explore any theories of defense due to his access to those witnesses being blocked by the direct and threatening e-mails and the aggressive nature of the investigator.

Yet, at the hearing, there was more than merely character evidence suggested as being the only evidence that was blocked by the government. Deputy Stenson's testimony constituted direct exculpatory evidence that undermined the entire prosecution. Stenson testified that Sims

had recanted the allegations he had made against Linder to Stenson shortly after he had reported that alleged assault to McPherson and other Marshal Service management personnel. Sims told Stenson: "I jumped the gun. I made a mistake. I should have [taken] the time to file an accurate complete report." Stenson further testified that Sims told him: "I was scared that if I didn't file it immediately that I would be accused of, myself, of some wrongdoing." Finally, Stenson testified that Sims told him that he "felt bad about filing an inaccurate report," and that he "was going to take the initiative to contact the investigators to let them know he made a mistake, that he didn't write a complete and accurate report, and he jumped the gun."

This testimony must be understood in context with the other evidence used to present this case to the grand jury. Critical to Stenson's testimony is his own credibility. Unlike many of the other deputies who were friends with Linder and were obviously concerned about their friend being prosecuted, Stenson came with no predisposition. He stated that he is not friends with Linder. In fact, he is friends with Sims. His demeanor on the witness stand evidenced an impartial and even ethically torn individual who tried to provide mentoring advice to his friend to do the right thing carefully. In spite of that, he learned devastating information about the prosecution and believed that he could not share that information with fear of reprisal. He sought legal advice.

There are only two complaining witnesses who provided the basis for the prosecution: Sims and Solis. Sims's credibility is substantially undermined, if not eliminated, by this recantation of his original complaint to OIG as described through the credible testimony of Stenson. Without Sims' testimony, the government must rely solely on Solis, the victim who needed to be interviewed three times before he even stated anything about an incident with a "task force officer." The victim provided the statement only after being asked a number of times

and after having photos taken of his face. None of this was provided to the defense due to the fear of discipline. Stenson refused to discuss this matter with Linder's defense team because of the Marshal's e-mails. Stenson also testified that he would not speak with the defense, *even now*, unless he is subpoenaed. Stenson is still concerned about interacting with the defense because the Marshal can make determinations about his career.

Stenson's testimony at the hearing revealed precisely the kind of evidence that the defense has been unable to gather because of the interference and intimidation caused by the government e-mails and the aggressive investigation tactics of Shirley and the prosecutors.

Stenson made it perfectly clear during the hearing that he would not meet with Linder's defense team because of the Marshal's edict. Stenson testified that he was approached by Linder's counsel in a courtroom in early 2012, and that the attorney stated that he wanted to ask him some questions. Stenson responded that there was a "standing order" by the Marshal stating that "I could not answer any questions or talk to you or any other third party without getting permission from the U.S. Marshals Service here in Chicago." Stenson had received and reviewed the e-mails and from those e-mails he understood that he "would be disciplined" if he spoke to the defense without receiving permission from the Marshal.

Stenson was not the only witness who testified beyond character evidence. Linder's defense team also attempted to contact Theodore Stajura, from the GLRFTF, but he never spoke to them. He had concerns about meeting with Linder's attorneys because of Shirley's conduct and the repercussions that might befall him and his officers. Stajura believed that "everything should be coordinated through the government." He further testified that he was fearful about dealing with Shirley and Cha because the Investigator and the AUSA sent the clear message to him that he would be prosecuted if he was supporting Linder.

89

Stajura was on the scene when Linder allegedly assaulted Solis, and the defense believes the he possesses material and favorable evidence and information to Linder. Stajura was interviewed by Shirley, and later by the Assistant United States Attorneys, Cha and Blumberg, and he testified in the Grand Jury. McPherson's e-mail was delivered directly to Stajura's Blackberry. Stajura testified that he thought the e-mail basically said to "cease and desist" all contact with Linder. Stajura followed McPherson's directive, especially after he asked Ed Farrell about it and Farrell told him to "heed it and listen to it." Stajura's testified as a credible witness who genuinely feared that he could lose his position with the Marshal Service if he spoke to Linder or even socialized with him. He candidly described how he did not want to put his position in jeopardy.

Not only was Stajura concerned for himself, he took the warnings so seriously that he spoke to the officers under his command on the GLRFTF about the e-mails. He told the officers about the rules, which he described as coming from the "highest level," and instructed the officers to limit their association with Linder. Stajura gave these instructions to at least five officers with knowledge of the events of July 8, 2010, the date of the alleged assault charged in Count I of the Indictment. While Stajura told his officers to cease contact with Linder, he simultaneously told them that they "had to cooperate with the investigation that was being conducted by Senior Special Agent Shirley." Stajura testified that he was "fearful of prosecution from Special Agent Shirley and [Cha] and the other prosecutors[.]" Stajura was a believable witness who was not hyperbolic in his presentation but rather candid about his fear.

The defense believes that Stajura would be able to provide evidence and information that refutes the Government's allegations. He was in close proximity to the van in which the alleged assault occurred and was able to observe Linder, Sims, and others. He did not see or hear an

assault, nor was there any discussion or activity indicating that an assault had taken place. The alleged victim did not request any medical attention, and none was required. Furthermore, the alleged victim did not display any marks or bruising consistent with an assault. Stajura has refused the defense's requests for an interview to confirm his observations at the scene of the alleged assault.

The testimony of Stajura when coupled with the recantation of Sims and the weakness of Sims's delayed report of the incident to the investigators constitutes more evidence of a material and exculpatory nature that was blocked by the government. Stajura's statement that he was in proximity of the incident when it occurred and that he did not hear anything, see anything and most importantly that no one, including the victim stated anything, corroborate's Linder's version of the events. The lack of any discernible injury immediately after the incident further corroborate's Linder's version. Stajura, like the Stenson, another credible witness with no motivation to fabricate, had material and helpful information for the defense and he did not provide it due to his fear that he would be disciplined.

Stajura also offers insights into the government behavior that takes this matter from a mere miscommunication to an intentional violation of Linder's constitutional rights. If the case only involved the unfortunate misstep of the Marshal sending out poorly worded e-mails at the direction of OGC and then remedying those missives by sending out a follow-up e-mail a few months later, the Court might be analyzing this case differently. Certainly, the government wants the Court to look at the e-mails as a mere administrative gaff that was rectified once it was brought to the Court's attention. Yet, the e-mails were only one piece of an overly aggressive prosecution marked by a federal agent who threatened witnesses with prosecution and prosecutors who joined in by threatening witnesses who would not provide them with the

statements they wanted to hear with either being charged with perjury or becoming a focus of the prosecution itself.

One of the most credible witnesses to testify was Inspector Jim Smith, a seasoned veteran of the Marshal Service. Smith was candid and forthright that the messages that were received were so atypical that it was no wonder that the deputies acted in fear as they did. Having lived through the Ambrose investigation and prosecution, he highlighted how the difference in e-mails made all of the deputies fear that their jobs were at stake. His calm and professional demeanor on the witness stand was that of an experienced professional of over twenty five years and marked a stark contrast with that of Inspector Shirley. Smith was looked up to by other deputies who turned to him for advice about how to proceed. Having never seen such harsh warnings in his career, he took them seriously and conveyed to his supervisees that they should do so also. His concern was evident. He feared for both his position that he had served honorably for a quarter of a century and he feared for those who worked for him and he sought to warn them not to sacrifice their jobs.

In stark contrast, Inspector Shirley's testimony was marked with his unfounded belief that he was being thwarted by the deputy marshals and the Marshal Service management at each step of his investigation. Rather than realize that it is the obligation of the trained investigator to develop his case in spite of individuals who may not want to speak with him; Shirley, and later AUSA Cha, chose to deem each reluctant witness as a target of the investigation. If the witness was not for them, he was against them. If the witness was deemed to be against them, he was deemed a target and a coconspirator. Shirley's demeanor on the stand was more like that of an untrained investigator who developed an unfounded belief that each witness that did not want to volunteer evidence for him must be a criminal who was worthy of federal prosecution. When

deputies did not want to speak with Shirley and Cha, they turned to the Marshal to complain that his employees were not doing their bidding.

Shirley's demeanor on the stand was less than credible as was pointed out earlier with his inconsistent statements. Shirley reached conclusions without support and developed a conspiratorial theory for anyone who did not speak with him. In response to a reluctant witness at the task force who did not want to be pulled from his official duties, Shirley unprofessionally and aggressively told the witness while the witness was on duty that Shirley "owned him" evidencing his aggressive belief that he was required to impose his authority over the witness to control him and instill fear in him.

As a former federal prosecutor, the Court is well aware that it is within the Executive Branch's power and authority to candidly warn a target of a prosecution that he can be charged with criminal offenses of which the prosecutor is aware and has evidence to support. This aggressive questioning can even include the candid threat of various sentences that a target could receive based on the evidence. But there is a difference between candidly and aggressively threatening a target with prosecution for offenses for which the target can be charged and the flippant threat that a target will be prosecuted for lying simply because that witness is not answering the investigator's questions in the way that the investigator believes they should be answered. Without support for such an accusation, the threat of prosecution for perjury or for conspiring with the defendant crosses the line and becomes of threat from an overbearing investigator used to bully the witness into compliance. The witnesses who testified that they were bullied, threatened, and treated like perjurors were not targets of the investigation. Not once did the government state that these witnesses were targets who could be charged. Instead they used the threats of prosecution as a standard way of conducting business. When the

witnesses did not provide them with the help they believed they should have received, they even went so far as to meet with the Marshal for the sole purpose of complaining to him that his employees were not being cooperative and therefore creating a division within his ranks. The sole purpose of such a meeting was to once again engage the Marshal to aid them in their investigation. Shirley's demeanor on the stand verified that this was his belief – that he was entitled to complete compliance with each of his requests and his interviews and anything less would result in a severe result – prosecution.

Even beyond this testimony, there was even more testimony that was material and helpful to Linder. John Hadjioannou, from the Great Lakes Task Force, is also a percipient witness to the assault alleged in Count I of the Indictment. Linder's attorneys attempted to contact Hadjioannou more than once about Linder's case. He has not spoken with Linder's counsel and has refused to speak with the defense team. Hadjioannou saw the e-mails because they were printed out and accessible at the GLRFTF office. He testified that because of the e-mails "[he] [didn't] want to get involved with this case." He further testified that he "didn't want to be thrown off the Task Force for doing something that other U.S. Marshals were actually told not to do." Hadjiouannou was another credible witness. It was clear that he genuinely believed that he could lose his job if he, in any way, had contact with Linder, whether socially or for the case.

This comment was one that was repeated by various deputies in one form or another throughout the hearing. All of whom credibly testified that the fear of losing their job was a significant fear and one which they could not risk. It is important to take into account that the job of the deputy US Marshal and those task force members who serve with them are vocations that take years to obtain. Unlike the private sector, these positions are highly sought after and

94

take years of training and testing before one will be accepted into the position. Aside from the years of education and training, the deputies must be reviewed in rigorous physical fitness testing, psychological testing, and an elaborate review process that culls out only the most qualified candidates. Once sworn in as a deputy Marshal, these men and women accept a low salary to do some of the most dangerous law enforcement tasks expected of federal law enforcement officers including apprehending criminal fugitives. It took the majority of the witnesses years to become deputies and records show that the attrition of deputy Marshals is minuscule in comparison to other job statistics.

As such, when a deputy testified that he feared he would lose his job, it meant that it would essentially end a vocation that he had devoted his training, education and passion to fulfilling. Unlike a private sector position where an employee might reasonably choose to leave a position and take up another with another firm, these government servants would be sacrificing a career that most would never envision leaving. The threat of discipline was equally as devastating to these deputies. Once a deputy carries the disciplinary sanction on his record, he is essentially rendered incapable of a significant portion of his duties: testifying in court. That disciplinary record would be required to be turned over to the defense in any case in which the deputy were to testify and would be used to attack the deputy's credibility on the witness stand. As such, management may chose to move that deputy from a position where he would be in a position to testify so as to avoid the risk of weakening a prosecution. In short, discipline and discharge must be taken in the light of a deputy Marshal's role and service and when it is, the threat of either carries a heavier weight than that threat levied against a civilian employee.

With this understanding, the Court heard the testimony of Hadjioannou who also testified that he has information that could benefit Linder at trial. Hadjioannou believes that the

information he has is important to the underlying facts of the case, yet he feels that he has been hampered in communicating that information to the defense. Shirley intimidated Hadjioannou and indirectly impacted his decision not to speak with the defense. His testimony was credible. Hadjioannou testified that Shirley was "intimidating" during their interview, and made him feel like he was the target of an investigation. Cha and Blumberg made him feel like he had received a "beat down" during their interview with him. They accused him of lying and they threatened him with consequences.

Another credible witness, Farrell, testified that he had not been able to discuss important matters with the defense because of the e-mails and the fall-out since the e-mails were distributed. The defense contends that Farrell is an important witness because he supervised Linder on the GLRFTF, was present when McPherson interviewed Linder, and can testify as to what occurred during that meeting, and because of his communications with Linder around the time of the alleged assault. Farrell feared the loss of position and testified credibly to the aggressiveness of Shirley and Cha who became confrontational with him because he could not remember details from a year earlier.

Paul Zitsch of the Task Force was also present at the time of the incident alleged in Count I of the Indictment. He spoke with the Government "several" times, met with Shirley and the Assistant United States Attorneys, and testified in the Grand Jury. Zitsch received and read the McPherson and McFarden e-mails. He subsequently was contacted by the defense investigator. He did not feel comfortable calling him back. Zitsch told the defense investigator that he had to follow the rules. The defense believes that Zitsch also has information favorable to the defense, as he saw the alleged victim without any marks or bruising after the alleged assault. In addition, Zitsch drove with Sims from Cicero, Illinois, the site of the alleged assault,

to the Dirksen Federal Courthouse in Chicago immediately after the alleged assault, and yet Sims said nothing about it to him.

Another witness, Troy Brejc, met with Shirley, was interviewed by the Assistant United States Attorneys, and testified in the Grand Jury about the events charged in Count I, as well as about Linder's character. Brejc was contacted by the defense investigator, but he has not spoken with the defense about the case. He testified that although he wanted to cooperate with the defense, "[he] didn't believe [he] was allowed to." Brejc was another credible witness who testified that he was so fearful that he actually sought legal advice and believed he needed to protect himself. He ultimately did not cooperate with the defense, in part, because of the e-mails. Brejc did not seek authorization from McPherson to speak with Linder or his counsel because he did not want to deal with the "ramifications."

This evidence clearly demonstrates that the Government interfered with witnesses' free choice to testify and deprived Linder of material testimony. When the government's actions substantially impair a witness's decision to testify, such as by threat, coercion, interference, or intimidation, and the witness's free decision to testify is hampered, the government has denied the defendant of his Fifth Amendment right to due process of law and his Sixth Amendment right to compulsory process of witnesses in his favor. *Burke*, 425 F.3d at 411. In this case, the e-mails sent from the Marshal's office threatened, interfered with, and intimidated potential defense witnesses. The proper remedy for such misconduct is the dismissal of the Indictment. *Id*. The Government's action here goes well beyond merely advising witnesses of their choice to testify. *See Bittner*, 728 F.2d at 1041. "It is well-settled that substantial government interference with a defense witness's free and unhampered choice to testify violates the defendant's due process rights." *Newell*, 283 F.3d at 837. The Court concludes that the Government

substantially interfered with potential defense witnesses's free and unhampered choice to testify and blocked the defense's ability to interview potential witnesses who had material evidence that would be beneficial to the defense.

## III. The Government's Infirm Legal Analysis

The Court agrees with Linder that the Government "offers very little in terms of legal analysis[.] Instead, it merely mentions general rules of law from a handful of cases, and then fails to explain why any of those rules prevent the Court from dismissing the indictment in this case." (Doc. 86, Def.'s Post-Hr'g Br. at 23.) The Government briefly cites to *Burke*, 425 F.3d 400, and *Skilling*, 554 F.3d 529, to establish the burden of proof that a defendant must meet for dismissal of an indictment based on the Fifth and Sixth Amendments and to note the general constitutional rights of a criminal defendant to interview and obtain access to witnesses pursuant to the Compulsory Process Clause. (Doc. 87, Gov.'s Post-Hr'g Br. at 4.) "While Linder does not object to the general propositions of law as cited in the government's scant two-page legal discussion," (Doc. 98, Def.'s Resp. to Gov.'s Post-Hr's Br. at 23), the Court finds that the Government's string citations are to no avail in furthering its legal arguments in light of the evidence received during the evidentiary hearing.

The Government cursorily raises *Skilling*, 554 F.3d 529, and *Bittner*, 728 F.2d 1038, in an effort to argue that none of the relevant witnesses refused to be interviewed by the defense due to the Marshal's "specific rules" disseminated in the McPherson and McFarden e-mails. (Doc. 87, Gov.'s Post-Hr'g Br. at 12.) However, this argument grossly mischaracterizes the testimonial evidence and the applicability of the cited jurisprudence. In *Bittner*, 728 F.2d at 1041-42, the defendant raised governmental interference where the victim refused to speak with the defense after a Federal Bureau of Investigations agent advised her, prior to trial, that she

could refuse to be interviewed. The Eighth Circuit found that the victim simply exercised her right to refuse to be interviewed and that the agent did not interfere with her "free choice" by merely advising her of her rights. *Id*. The court held that "[c]ontacts of that nature do not constitute an impermissible interference with the defendant's right of access to witnesses." *Id*. at 1042. While this is an accurate statement of law, the Government seems to misapprehend it, and has selectively and wrongfully applied it to the evidence in this case.

The Government focuses on the testimonies of McPherson, Walenda, and Zitsch, claiming that their refusals to meet with the defense were "independent" of the "specific rules." (Doc. 87, Gov.'s Post-Hr'g Br. at 12.) However, the Government willfully and completely ignores the testimonies from seven other witnesses, all of whom testified that the "specific rules," in addition to the conduct of Shirley and other members of the prosecution team, prevented them in some way from communicating with the defense. (*See* Tr. at 373-77; 393; 406; 415-15; 421-28; 457-58; 463-68; 474-76; 480-81; 485-90; 504-05; 516-17; 530-35; 537-39; 540-43; 562; 564-65; 671-75; 684-85; 689; 693-704; 712; 717; 719-22.) As evidenced by the testimonies of Stenson, Farrell, Smith, Hadijioannou, Brejc, and Stajura, this was not a case of "free choice" like that in *Bittner*, 728 F.2d at 1042, where the witness voluntarily chose on her own not to speak with the defense.

As further demonstrated by the testimonies of O'Malley, Farrell, and Stajura, other Marshal Service and Task Force members were also intimidated by the e-mails, expressed concerns about the meaning and import of the "specific rules," and complained about Shirley's threats and intimidations. (*See* Tr. at 343-44; 417-19; 488-90; 494; 509-10.) Thus, the evidence as a whole demonstrates that this was not a *Bittner* situation where the conduct at issue was harmless and only aimed at advising someone of her rights. 728 F.2d 1041-42.

Similarly, in another attempt to rely on *Skilling*, 554 F.3d 529, the Government tries to portray the testimony of Brejc, arguing that as a "legal matter" there can be no " 'substantial governmental interference' with the defendant's right to access witnesses" where a witness has "multiple reasons" for refusing a defense interview. (Doc. 87, Gov.'s Post-Hr'g Br. at 12.) In *Skilling*, 554 F.3d at 565-75, the defense raised its constitutional challenge based on various types of intimidation and interference that had allegedly been committed in several ways and involved multiple witnesses. The rule raised by the Government relates to an attorney, Robert Sussman, who represented several witnesses who expressed concerns about meeting with Skilling's lawyers. *Id*. at 568. Sussman testified at a hearing that "a number of factors informed his advice to clients that they should not cooperate with Skilling," and that the potential for government retribution or reprisal was only one "among a number of other factors." *Id*. at 568-69. As parenthetically cited by the Government, the court refused to find a due process violation based on the "multiple reasons" that the witnesses refused to meet with the defense. *Id*. at 569 (Doc. 87, Gov.'s Post-Hr'g Br. at 12-13.)

This is not, however, a bright-line rule as the Government portrays (and would like) it to be. The Government's citation to this particular holding in *Skilling* overlooks a critical fact considered by the Fifth Circuit in that case. 554 F.3d at 569. This is a fact that altogether distinguishes *Skilling* from the interference and intimidation in the case at bar. Sussman specifically testified that "the government had made no explicit or implicit statement that his clients should not meet with defense counsel." *Id*. The *Skilling* court found this fact of "particular importance" in holding that the district court did not err in determining that the government did not substantially interfere with Skilling's ability to interview Sussman's clients. *Id*.

Based on this rationale, the Government's reliance on *Skilling* is inapposite for two primary reasons. First, even if Brejc had "multiple reasons" for not speaking with the defense, his testimony demonstrates that those "multiple reasons" were *all* based on his fear of the Government in some capacity. (*See* Tr. at 667-68; 670; 671-75; 685; 689.) Second, unlike *Skilling*, this case obviously involves an explicit statement from the Government the Marshal Service and Task Force members that they were not allowed to meet with Linder's counsel or have any contact with Linder himself.

The evidence is much different in this case insofar as it involves explicitly prohibitive statements that were circulated, on more than one occasion, and that are identified as "special rules" with accompanying United States Marshals Service and Department of Justice offenses and disciplinary sanctions. As the testimony from the hearing shows, those "explicit" statements also conveyed a very "explicit" and "implicit" message that reverberated throughout the Marshal Service in the District and the GLRFTF, instructing personnel not to meet with Linder or his counsel. *See Skilling*, 554 F.3d at 569 ("Of particular importance, . . . the government had made no *explicit* or *implicit* statement that his clients should not meet with defense counsel.") (emphasis supplied). The constitutional violations in the instant case are far more egregious, and *Skilling* weighs in favor of finding that Linder's Fifth and Sixth Amendment rights were violated by Shirley and the prosecutors. *Id.* ("The Sixth Amendment guarantees a criminal defendant the right to present witnesses to establish his defense without fear of retaliation against the witness by the government, and the Fifth Amendment protects the defendant from improper governmental interference with his defense.") The Government's assertion that Brejc's testimony cannot "legally or factually" support a finding of substantial Government interference,

(Doc. 87, Gov.'s Post-Hr'g Br. at 13), is unsupported by the record, as well as the holding in *Skilling*.

The Government does expound somewhat substantially on the Supreme Court's decision in *Valenzuela-Bernal*, 458 U.S. 858. (Doc. 87, Gov.'s Post-Hr'g Br. at 4.) *Valenzuela-Bernal*, as accurately stated by the Government, concerned a due process challenge after a prosecutor deported witnesses whom the defense had not had an opportunity to interview. In *Valenzuela-Bernal*, the Government's action in placing potential alien witnesses beyond the court's subpoena power before the defendant was afforded an opportunity to interview and subpoena them was held not to violate the defendant's Fifth Amendment right to due process and Sixth Amendment right to compulsory process of witnesses in his favor. *Id.* at 874 ("In this case the [defendant] made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense. Under the principles set forth today, he therefore failed to establish a violation of the Fifth or Sixth Amendment, and the District Court did not err in denying his motion to dismiss the indictment.").

In *Valenzuela-Bernal*, the defendant was convicted of violating 8 U.S.C. § 1324(a)(2), which proscribes the knowing transportation of an alien who last entered the United States within three year prior to the date of transportation. *Id.* at 860. The defendant, with five passengers in his vehicle, had refused to stop at a checkpoint upon the order of a Border Patrol agent. *Id.* at 861. "[The defendant] accelerated through the checkpoint and was chased at high speed for approximately one mile before stopping the car and fleeing on foot along with the five passengers. Three of the passengers and [the defendant] were apprehended by the Border Patrol agents." *Id.* After the passengers admitted to being in the Country illegally and identified the defendant as the driver, "[a]n Assistant United States Attorney concluded that the passengers

possessed no evidence material to the prosecution or defense of [the defendant] for transporting illegal aliens, and two of the passengers were deported to Mexico." *Id.*  The defendant argued "that the deportation had deprived him of the opportunity to interview the two remaining passengers to determine whether they could aid in his defense." *Id.*

After a bench trial in the United States District Court for the Southern District of California, the defendant was found guilty of the charges against him. *Id.* at 860.  However, the United States Court of Appeals for the Ninth Circuit overturned his conviction, *United States v. Valenzuela-Bernal*, 647 F.2d 72, 75 (9th Cir. 1981), holding that "the Government here selected certain aliens for detention while returning others to Mexico; the deported aliens were eyewitnesses to, and active participants in, the crime charged, thus establishing a strong possibility that they could have provided material and relevant information concerning the events constituting the crime."  The Ninth Circuit further stated that "the Government's action in placing potential alien witnesses beyond the court's subpoena power before the defendant was afforded an opportunity to interview and subpoena them violated the defendant's Fifth Amendment right to due process and Sixth Amendment right to compulsory process." *Id.* at 73.

Certiorari was granted, 454 U.S. 963 (1981), and the Supreme Court of the United States reversed the judgment of the Ninth Circuit. *Valenzuela-Bernal*, 458 U.S. at 860.  The Court began by noting that "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" *Id.* at 867 (quoting U.S. Const., amend. VI; *Washington*, 388 U.S. at 16) (internal quotation marks omitted) (emphasis in original).  Relying on this language, the Court stated that a criminal defendant "cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation

of the passengers deprived him of their testimony." *Valenzuela-Bernal*, 458 U.S. at 867.  Rather, the Court held that in order to show a violation of his rights under the Fifth and Sixth Amendments to the United States Constitution, the defendant must "at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Id*.

As mentioned by the Government, the *Valenzuela-Bernal* Court discussed the requirement that the unavailable evidence be material.  *Id*. at 867-68, 872-74.  "Linder does not object to these general propositions of law," however, the Government's application of them is misplaced and overlooks that *Valenzuela-Bernal* is distinguishable from the instant case.  (Doc. 98, Def.'s Resp. to Gov.'s Post-Hr's Br. at 26.)

To begin with, the holding of *Valenzuela-Bernal* was narrowly tailored it is to facts alleging a constitutional violation based on the government's deportation of witnesses.  458 U.S. at 873 n.9 (Stating that "[i]n adopting this standard, *we express no opinion on the showing which a criminal defendant must make* in order to obtain compulsory process for securing the attendance at his criminal trial of witnesses within the United States.") (emphasis supplied).  The Seventh Circuit has adopted the *Valenzuela-Bernal* materiality requirement specifically in the context of a Sixth Amendment challenge to the government's deportation of witnesses.  *See United States v. Pizarro*, 717 F.2d 336, 345 (7th Cir. 1983) (quoting *Valenzuela-Bernal*, 485 U.S. at 873) (internal quotation marks omitted) (alteration in original) ("As the Supreme Court has recently instructed us, absent some showing of intentional governmental misconduct, a defendant can establish no Sixth Amendment [or Due Process Clause] violation without making some plausible explanation of the assistance he would have received from the testimony of the [missing] witness."); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000)

(noting that "[t]he principles of *Valenzuela–Bernal* have been followed uniformly by the courts of appeals").

Additionally, the Government does not acknowledge the Court's rationale in upholding the government's conduct based on its own unique needs in *Valenzuela–Bernal*. The *Valenzuela–Bernal* Court considered the tension that the government is confronted with in upholding its "dual responsibility" to prosecute those accused of violating the laws of the United States, while at the same time upholding Congress's immigration policies, which may require the deportation of individuals who are witnesses to a crime. 458 U.S. at 864-65. The Court stated that "[t]he Government may, therefore, find itself confronted with the obligation of prosecuting persons in the position of [the defendant] on criminal charges, and at the same time obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted." *Id*. at 864. The Court found that the power to regulate immigration is entrusted to the political Departments of the federal government, and that Congress's immigration policy includes the prompt deportation of illegal alien witnesses. *Id*. at 864. "In addition to satisfying immigration policy, the prompt deportation of alien witnesses who are determined by the Government to possess no material evidence relevant to a criminal trial is justified by several practical considerations. . . . Thus, the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime." *Id*. at 865. The Court found that "the responsibility of the Executive Branch faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such

witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." *Id*. at 872-73. The Court held that the government had "good reason" to deport the witnesses "once it concluded that they possessed no evidence relevant to the prosecution or the defense" and that the "discharge of the obligations imposed upon it by Congress" and "[t]he mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." *Id*. at 866, 872-73.

In contrast to *Valenzuela-Bernal* and other cases in which deportation is at issue, the Government's interference and intimidation in this case is neither required to uphold Congressional policies or acts, nor is it supported by any practical considerations, financial burdens, or other compelling needs of the Government to exercise its prosecutorial function. Furthermore, in *Valenzuela-Bernal* "the [defendant] simply had no access to the witnesses who were deported;" in this case the constitutional violations committed by the Government against Linder are not merely based on a general lack of access to witnesses. *Id*. at 869. On the contrary, in the instant case the Government put up and imposed affirmative and explicit barriers, upon threat of severe (and even criminal) consequences, to prevent defense access to witnesses. The Court acknowledges that witnesses with material and favorable evidence and information exist, and that they have refused to speak with Linder's counsel.

The Government incorrectly asserts that the Court should deny the motion under consideration "unless the defendant conclusively demonstrates that the information sought is no longer available." (Doc. 87, Gov.'s Post-Hr'g Br. at 5.) The Government's declaration is an inaccurate statement of a rule of law; it misconstrues the holding in *Valenzuela-Bernal* and is unsupported by law. The Sixth Amendment *will* be violated where the defendant can provide a

"plausible explanation of the assistance he would have received from the testimony" of a given witness, or where the defendant is able to make a showing that the witness had material and favorable evidence.    *Valenzuela-Bernal*, 458 U.S. at 867-69 (discussing, *inter alia*, the "materiality" requirement of *Washington*, 388 U.S. at 16) (alterations in original) ("In *Washington*, this Court found a violation of this Clause of the Sixth Amendment when the defendant was arbitrarily deprived of 'testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense."); *Brady*, 373 U.S. at 87 (holding "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material"); *Moore v. Illinois*, 408 U.S. 786, 794 (1972) (holding that "[t]his materiality requirement was emphasized" by the Court in *Brady*).    Applying this rule of the government's deportation of the witnesses in *Valenzuela-Bernal*, the Court declined to find a violation because the defendant "made no effort to explain what material, favorable evidence the deported passengers would have provided for his defense." 458 U.S. at 874.

Unlike the Defendant in *Valenzuela-Bernal*, Linder has provided this Court with abundant evidence of how the intimidated witnesses could have assisted him in his defense. Linder has provided the Court—in pleadings, motions, testimonies, and exhibits—with numerous accounts of how the intimidated witnesses possessed material, and in some cases, exculpatory, evidence and information, all of which would assist and support him in defending against the Government's charges in the Indictment.  The *Valenzuela-Bernal* standard applies to deportation cases, and does not require a *prima facie* showing, but rather only demands that the defendant makes a sufficient *explanation* of materiality.  458 U.S. at 872 (citing *United States v. Lovasco*, 431 U.S. 783 (1977); *United States v. Marion*, 404 U.S. 307 (1971)) (emphasis supplied) ("Such an absence of fairness is not made out by the Government's deportation of the

witnesses in this case *unless there is some explanation of how their testimony would have been* favorable and *material*.").

Finally, the Court notes that the remedy of dismissal of the Indictment is the only sanction that can effectively remedy the severe violations committed by the government in this case. The government argues that there is no prejudice because the defense now has the information that it did not have before and as such, an extension of discovery can remedy the injury by allowing the defense to develop the witness testimony now – three years after the incident – and prepare for trial. The government fails to take into account the severe prejudice to the defendant that has occurred over the past three years while he has awaited trial. Defense counsel has informed the Court that his client no longer is willing to agree to any exclusion of time from the speedy trial clock because he is desparate to finish the matter due to the significant burden that the pretrial period has had on him personally and on his family both psychologically and financially. Therefore, the government would only be rewarded for its aggressive and unconstitutional behavior if a mere extension of discovery would effectively remedy the violation. The violations here can not be remedied by a mere extension of time especially in light of defendant's request for a speedy trial.

## THE REMEDY

The e-mails sent by United States Marshal Service, at the direction of the Office of the General Counsel, directly interfered with the defendant's constitutional right to compulsory process of witnesses in violation of the Sixth Amendment and the government investigator and prosecutors intentionally interfered with defendant's right to conduct a defense investigation and interview prospective witnesses through the use of unsubstantiated threats of prosecution in violation of the Fifth Amendment. The defense has presented numerous witnesses who were

intimidated into silence who could have provided the defense with information that would be both material and helpful to the defense. The remedy for such a severe violation of the defendant's constitutional rights is dismissal of the indictment.

## CONCLUSION

For the reasons set forth above, Linder's motion to dismiss the indictment (R. 26) is GRANTED.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 5, 2013